JOB BACON ET AL., PROSECUTORS, v. JAMES L. MULFORD, COLLECTOR OF THE TOWNSHIP OF GREENWICH.

An act which empowers a township to raise by tax such sums as may be, necessary for the building, rebuilding and repairing such wharf as they own in the township, is invalid as an authority for an assessment, when it appears that the township owns no wharf.

On *certiorari.*

This writ brings up an assessment of a tax made in the township of Greenwich, in pursuance of a resolution passed by the town meeting of the inhabitants of Greenwich township, held on March 14th, 1876. The following is the resolution :

"*Resolved,* That the sum of $1500 be raised for the purpose of building and constructing a wharf on Cohansey creek, at the foot of the main street, in the township of Greenwich, and that the township committee be authorized to contract with any person or persons for the construction of the same."

This resolution was passed in supposed conformity with the authority conferred by an act passed in 1848. *Pamph. L., p.* 80. The first section of the act is as follows :

" That the inhabitants of the township of Greenwich, in the county of Cumberland, are hereby authorized and empowered, at their annual town meeting or any special meeting duly held for that purpose, to raise by tax, in the same manner as all other taxes are raised for township purposes, any sum or sums of money that may be necessary for building, rebuilding or repairing such wharf or wharves as they own in the

township aforesaid, and also such sums of money as from time to time may be required to keep the same in good repair."

Twenty-two writs were taken by persons assessed under the above resolution, and by stipulation of counsel they are all to be determined together, upon the testimony taken in one case. The grounds taken against the legality of the assessment will appear in the opinion.

Argued at June Term, 1878, before Justices VAN SYCKEL, DIXON and REED.

For the plaintiffs, *W. E. Potter.*

For the defendant, *J. R. Hoagland*

The opinion of the court was delivered by

REED, J. The first objection taken to the assessment is, that the act of 1848, upon which it rests, was rendered inoperative upon the adoption of paragraph twelve of the amended constitution of 1875. The paragraph is this : " Property shall be assessed for taxes under general laws and by uniform rules, according to its true value." The argument is that this assessment is made under a special act, and for a purpose foreign to the general powers of townships in this state, and that the constitutional provision already mentioned, *proprio vigore*, repealed the statute. *State, North Ward National Bank, pros.,* v. *Newark,* 10 *Vroom* 380. But the act does not provide for a method of assessing property differing from the general law. It only provides for an additional subject matter for township regulation and expense. This results, it is true, in the imposition of additional tax, but the property in the township is assessed under the general tax law. No person is specially exempted and no kind of property is specially relieved from its burden. Under the diverse municipal charters in this state, no two cities, probably, have identical departments of government and methods and objects of municipal expenditure. Each charter is, therefore, special in the same sense

that this act is special. Each has its distinct object of public expense, for which it is empowered to levy and collect assessments. But so long as the tax is levied under general laws, I do not understand that there is any infringement of this paragraph, no matter what the source or object of the levy which is so imposed. The township tax, including the tax for the construction of this wharf, is imposed under the general tax law of the state, in conformity with this paragraph of the constitution.

The counsel for the prosecutors then urge that if the act of 1848 is constitutional, there is yet no authority shown for the imposition of this tax. The argument is, that the power to raise money by taxation to be imposed upon the inhabitants of Greenwich township is to raise money for a specific purpose, namely, for the purpose of building or repairing such wharf or wharves as the said inhabitants own in said township; that the said inhabitants own no wharf in that township; that therefore the object upon which the expenditure of this money is to be made, does not exist.

If it be true, as a fact, that the inhabitants of the township of Greenwich own no wharf in the township, it must be admitted that the condition upon which the power to assess, under the act of 1848, was conferred, is absent. The power is given upon the supposition that such wharf or wharves exist. The non-existence of such wharf annuls the act.

Indeed, the position of both prosecutors and defendants assumed the necessity of proving the existence of a wharf belonging to the township. The body of the testimony taken in the cause is relative to the existence of such a wharf on Cohansey creek, at the point where the township committee had commenced to build the structure for which this tax is said to be imposed.

It appears from the testimony that the point at which the inhabitants of Greenwich township claim the existence of a wharf is between two wharves now in existence on Cohansey creek, and known as the upper and lower wharf. These wharves appear to have existed, as to location, as far back as

the memory of the oldest inhabitants. They were used by the Shepherd family during all that time and treated by them as their property. Between these wharves there existed, until discontinued in 1838, a terminal point of a ferry across Cohansey creek, between the town of Greenwich and a point in the land of one Reeves, in the township of Fairfield. This ferry had its origin in an act of the provincial legislature passed in 1766. *Allinson's Laws* 292.

This act was passed upon petition of the inhabitants of the townships of Greenwich and Fairfield. It authorized the establishment of a ferry and fixed the rates thereof. It appointed the chosen freeholders of the two townships commissioners to erect such wharves as should be necessary for said ferry, with power to cause taxes to be levied for such expenses, and with power to rent the said ferry.

Two years later an agreement was entered into by which the chosen freeholders of said township did rent to John Shepherd the said ferry for the term of nine hundred and ninety-nine years.

Shepherd covenanted to keep up, amend and repair the wharves now erected and made pursuant to the above-recited act. This agreement was rescinded by another agreement made in 1838 by the parties who represented the original covenantors. This ferry continued in operation until about the time of the above rescission; the landing-place during all this time being between the two wharves. The boats were reached by a series of logs or timbers bound together and running from the shore down to low water mark. The slip thus formed was twelve feet wide, and was fastened to an abutment which stood next to the shore.

After the discontinuance of the ferry the slip fell to pieces, so that in 1848, at the time of the passage of the act authorizing the present tax, there were none or very few of the relics of that structure remaining. In fact, the ferry had been considered as permanently abandoned.

The legislature in 1842, (*Pamph. L.*, pp. 6, 7,) had, as appears from the preamble of the act, upon petition of the in-

habitants of the several townships of Greenwich and Fair-field that the said wharf was no longer necessary, repealed the act erecting it.

The repeal of the act carried with it all right to charge for ferriage or to tax for repairing wharves.

This continued until 1847, when an act was passed to empower the township of Greenwich to levy taxes for the purpose of building a wharf upon the land claimed by said township, &c. This act was repealed the following year, and the act of 1848, *supra*, substituted.

As we have seen, this confers power upon the inhabitants of Greenwich to expend money in building, rebuilding or repairing such wharf or wharves as they own.

In determining the question of the existence of an object upon which this tax can be expended, it is apparent that the act of 1848 contains no grant of a right to build or erect wharves. It was not even within the intention of the legislature to determine whether such ownership of wharves existed. The legislature merely says, if you have wharves you may repair or rebuild them through a tax which we authorize you to levy.

Did such wharves exist at the time of the passage? In construing the meaning of the term " wharves," as used in the act, I am unwilling to give it the narrow signification for which the prosecutors contend. I do not think it is limited to an actually existing artificial structure. It may indicate a locality as well as a structure, if the locality is known as a site designated for such a structure, or upon which such a structure has existed, and so marked the location as having once been or to be used for a landing-place.

But admitting this to be the legislative definition of the term " wharves," I am not able to see in what way the township of Greenwich, or the public represented by the township of Greenwich, owned, in any sense, such a place.

We have already alluded to the fact that the testimony discloses the fact that the site of the old wharf was almost entirely between high and low water mark. By a well-known

line of cases decided since the passage of the original act of 1766, it is established that the title to such land is not in the riparian owner, but in the king, before, and in the state since the Revolution.

There was no power in the provincial legislature, therefore, to grant any right in this soil. If the power existed, the repeal of the act in 1842 annulled the right, as it amounted to a mere license, revocable at any time. Had a structure which originally extended beyond high water mark been maintained, it would have carried the title of the riparian owner with it, if the structure did not interfere with the navigation of the creek. *Gough* v. *Bell*, 2 *Zab.* 441; *Stevens* v. *Paterson and Newark R. R. Co.*, 5 *Vroom* 5.

But the original structure, being a mere raft of logs lying on the ground, over which the tidal waters rose and fell, did not carry the high water mark, so far as appears in the testimony, beyond the present line. If it did so, its dilapidation and disappearance left the place as it was originally, with the title in the state, below high water mark. And this was its *status* in 1848.

Nor do I see that the township of Greenwich stands in any better position relative to the land above high water mark. The right of the township is, in the testimony, dependent upon a dedication to the public. The dedication is alleged to arise by a survey made to Phineas Chalkley, the return of which by the surveyor is dated June 9th, 1743, and which was recorded by the council of West Jersey proprietors on the 5th day of August, 1743, and is recorded at Burlington, Liber A, folio 285. The survey contains a description of an acre of land, and contains the following: "The said Chalkley only reserves to himself a small part that joins to his lot—[describing it]; the other part he doth give to the town of Greenwich for a public landing, and privilege of all the town." The place leading to the old wharf is alleged to be within the last-mentioned tract. But the insertion of the clause granting a part of the tract included in the return could not conclude Chalkley, unless there was some extrinsic recognition of the

binding force of such clause. The return of the surveyor who is to set off a portion of land to a party who holds a warrant, is intended to indicate the locality of the tract which is to be appropriated in severalty to the holder of the warrant. The history of these surveys is fully recapitulated in *Estell* v. *Bricksburg Land and Improvement Co.*, 6 *Vroom* 235. The recorded return is not a conveyance, but an acknowledgment by the owners of the property in common that a certain portion of the joint estate has been assigned to one of the original proprietors, or to an assignee of such proprietor, to hold in severalty. It is apparent, therefore, that the incorporation into the description, by the deputy surveyor, of the part set off of a grant to a third party, is without any validity as a conveyance.

Nor would it operate as a dedication, not being the act of the owner of the land, unless recognized by some word or act which shows an intention to devote the part to the use of the public. Now nothing appears to show that Chalkley ever did anything which recognizes the grant of this to the public. No allusion is made to it by any deed by Chalkley or his grantees, so far as appears in the cause.

Nor can the user of a small part of the tract as a terminus of the old ferry amount to a dedication of such to the public use as a landing. The use in itself cannot constitute a dedication. *O'Neill* v. *Annett*, 3 *Dutcher* 290. Nor is such use connected with the survey in such a way as to imply that the owner of the land adopted the clause in the latter, which grants the land for a landing. But even if the dedication by Chalkley was effective, I do not see how a wharf can be erected. The grant was that a certain tract of land, contiguous to the creek, could be used by the inhabitants of the town of Greenwich as a public landing. Now this may imply the right to attach a wharf to the land, and level up and grade, and do all that is essential to utilize the ground as a landing place, but it could confer no right to build a structure out beyond high water mark. The idea of a wharf stopping at high water is almost inconceivable, and it certainly was not

Jersey City v. Morris Canal and Banking Co.

within the understanding of any of the parties interested in the present structure. The old wharf was not so built, and the present is not proposed to be so built. The difficulty would still remain that, without a grant from the state or its representatives, there exists no right to erect a wharf, and the township of Greenwich is not the owner of any such structure or locality. The conclusion thus reached is not unsatisfactory upon what is conceived to be grounds of public policy. The proprietorship of a wharf is not usually within the scope of township regulation and government. The demand for a public wharf is not urgent where (as appears here) the citizens of this township, now, for the first time, attempt to exercise a right conferred thirty years ago.

The assessment is set aside, with costs.