45 N.J. Super. 445 (1957)
133 A.2d 373
RIVER DEVELOPMENT CORP., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
THE LIBERTY CORPORATION, A CORPORATION OF THE STATE OF PENNSYLVANIA, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided May 17, 1957.
*448 Mr. Louis B. LeDuc and Mr. Stephen M. Gretzkowski, Jr., attorneys for plaintiff.
Messrs. DuBois & DuBois (Mr. Josiah E. DuBois, Jr., appearing), attorneys for defendant.
Mr. Grover C. Richman, Jr., Attorney-General (Mr. Sidney Kaplan, Deputy Attorney-General, appearing), as amicus curiae.
HANEMAN, J.S.C.
Plaintiff seeks to enjoin the defendant from conducting certain dredging operations in the tidal waters of the Delaware River known as Fishers Cove in Pennsauken Township, Camden County, New Jersey, and incidental thereto seeks a declaration of its rights in and to such subaqueous tidal lands.
In 1830 the Camden and Amboy Rail Road and Transportation Company was organized by special act of the Legislature for the purpose of building a railroad between Camden and South Amboy. L. 1830, p. 83. Its charter provided, inter alia, as follows:
"Sec. 11. * * * authorized and invested with all of the rights and powers necessary to survey, lay out, and construct a rail road or roads, with all necessary appendages, * * * Provided, that the said road or its branches, shall not exceed one hundred feet in width on the surface of the road * * *."
No specific authority or license to fill in, reclaim or improve lands under water was included in the charter.
By deed dated November 22, 1831, William Folwell conveyed lands to the Camden and Amboy Rail Road and Transportation Company, as follows:
*449 "do grant, bargain, sell, convey and confirm to the party of the second part and their successors so much of the lands of the said party of the first part situate in the Township of Waterford in the County of Gloucester in the State of New Jersey, over which the line of the said Rail Road is now laid out and located as may be necessary for the use and construction of the said Road, the line of the said Road when completed not to exceed fifty feet in width * * * to the said Folwells other land purchased by him of the said Joseph Gardiner, and the said line not to exceed one hundred feet in width through and across the other farms of the said party of the first part, lying on the River Delaware when completed as aforesaid. TOGETHER with all and singular the ways water rights liberties privileges and appurtenances thereto."
The habendum clause reads as follows:
"peaceably and quietly, to enter upon, hold, occupy, possess and enjoy the said line of land and premises herein before conveyed or intended so to be, for the construction and use of the said road according to the provisions and conditions mentioned and contained in the act incorporating the said company."
The foregoing lands are now in Pennsauken Township. Whether the description included the high water mark is disputed.
Between that year and 1833 Lt. William Cook, of the United States Artillery, a surveyor and engineer, completed a survey showing the railroad's proposed right of way which, in part, was to traverse lands of William Folwell in the Township of Waterford, Gloucester County.
Prior to 1868 the Camden and Amboy Rail Road and Transportation Company, the Delaware and Raritan Canal Company and the New Jersey Railroad and Transportation Company entered into an informal consolidation. The result of this union became familiarly known as "The United Companies." In 1872 these three corporations were formally consolidated by act of the Legislature under the name "The United New Jersey Railroad and Canal Company." L. 1872, c. 223, p. 567, and p. 1402.
In 1869 the Legislature enacted chapter 386 (L. 1869, c. 386, p. 1026), hereafter referred to as the United Companies *450 Act, under which plaintiff claims. That enactment reads as follows:
"An Act to enable the United Companies to improve lands under water at Kill Von Kull and other places.
Whereas, the United Delaware and Raritan Canal Company, the Camden and Amboy Railroad and Transportation Company, and the New Jersey Railroad and Transportation Company, have recently secured to this state the payment of five hundred thousand dollars for the grant of lands under water, in front of lands owned by them, and are desirous of having the right and privilege of erecting and making wharves, piers and other improvements in front of other lands now owned by or in trust for them, so that they may safely make such improvements as they may find necessary to facilitate their business; therefore,
1. Be it enacted by the Senate and General Assembly of the State of New Jersey, That the said United Companies shall be and they are hereby authorized to reclaim and erect wharves and other improvements in front of any lands now owned by or in trust for them, or either of them, or by any company in which they now hold the controlling interest, adjoining Kill Von Kull or any other tide waters of this state; and when so reclaimed and improved to have, hold, possess and enjoy the same as owners thereof; provided, that such improvements shall be subject to the regulations (where applicable) as to the line of solid filling and as to pier lines heretofore recommended in the report of the commissioners made and filed under the act entitled `An act to ascertain the rights of the state and of the riparian owners in the lands lying under the waters of the bay of New York and elsewhere in this state,' approved April eleventh, eighteen hundred and sixty-four, but neither said improvements nor those which may be made by said companies in Harsimus Cove shall be subject to any other restrictions than those contained in said report; and provided further, that the said United Companies shall, on or before the first day of July next, pay to the treasurer of this state the further sum of twenty thousand dollars in full satisfaction for the right and privilege hereby granted; and provided further, that the said United Companies shall on or before the said first of July, file in the office of the secretary of state a map and description of the lands under water in front of the upland referred to in this section.
2. And be it enacted, That this act shall take effect immediately. Approved March 31, 1869."
The $20,000 was thereafter paid to the State of New Jersey.
A quadrant of the map and description of the lands here involved, as filed with the Secretary of State, is as follows:
*451 
*452 On June 30, 1871, prior to the formal consolidation of the "United Companies," the Camden and Amboy Rail Road and Transportation Company leased its entire property to the Pennsylvania Railroad Company for a term of 999 years.
On August 12, 1955 the United New Jersey Railroad and Canal Company sold and conveyed to plaintiff all of its estate, right, title and interest in and to subaqueous lands in front of the lands allegedly conveyed by Folwell, to a width of 1,000 feet, extending from the high water line of the Delaware River to the U.S. Bulkhead and Pierhead line of the Delaware River as established in 1940. Attached to this conveyance is a quitclaim by the Pennsylvania Railroad Company. The recited consideration is $1,000.
Neither the plaintiff nor any of its predecessors in title had reclaimed or erected wharves or other improvements upon the lands conveyed to plaintiff on August 12, 1955, as aforesaid.
The defendant is conducting dredging operations, under a license from the State of New Jersey, within the lines of the lands conveyed to plaintiff by the United New Jersey Railroad and Canal Company on August 12, 1955.
Because of the indirect effect which a determination of this cause may have upon other subaqueous lands, the court requested the intervention of the Attorney-General of the State of New Jersey as amicus curiae.
Plaintiff contends that the Folwell deed ran to the high water line of the Delaware River and that the Camden and Amboy Rail Road and Transportation Company acquired title in fee to the subaqueous lands riverward from said high water line by virtue of the United Companies Act, and that it has succeeded to the title of the Camden and Amboy Rail Road and Transportation Company by virtue of said mesne conveyances or, in the alternative, it has acquired, in the same manner, some other interest in said lands, which interest is not capable of definite classification but is similar to an irrevocable license or an option.
Inter alia, defendant denies that the Folwell deed ran to the high water line and contends that the United Companies *453 Act conveyed nothing more than a revocable license which has heretofore been revoked by the State of New Jersey.
In view of the conclusions hereafter stated, it will be necessary to treat only with the subject of the nature of the interest in lands under water granted by the United Companies Act, presuming, for the purpose of these conclusions only, that the Folwell deed did run to the high water line.
If a statute alters or amends previous law, it is important, in discovering the intent of the Legislature, to ascertain the old law, the mischief at which it was aimed, and the proposed remedy. Blackman v. Iles, 4 N.J. 82 (1950).
A brief chronological historical resume of the development of the law concerning subaqueous lands in this State, as far as they concern, are pertinent to, or relate to the lands here involved, is necessary to the ascertainment and determination of plaintiff's interest in these subaqueous lands.
Tide-flowed lands below the high water line were, in colonial days, deemed vested in the Crown. Upon the separation of this State from the mother country the title thereto was deemed vested in the State. Bailey v. Driscoll, 19 N.J. 363 (1955); Schultz v. Wilson, 44 N.J. Super. 591 (App. Div. 1957); American Dock & Improvement Co. v. Trustees for Support of Public Schools, 39 N.J. Eq. 409 (Ch. 1885); Bacon v. Mulford, 41 N.J.L. 59 (Sup. Ct. 1879); Gough v. Bell, 22 N.J.L. 441 (Sup. Ct. 1850), affirmed 23 N.J.L. 624 (E. & A. 1852).
The guardianship of these tide-flowed lands is in the Legislature of the State, and hence subject by statute to express grant of a freehold or lesser estate to any grantee, regardless of whether such grantee is the owner of the upland adjacent thereto. See L. 1837, p. 13; L. 1837, p. 64; L. 1868, c. 248, p. 551; L. 1869, p. 1017, c. 383, as examples thereof; American Dock & Improvement Co. v. Trustees for Support of Public Schools, supra; Bailey v. Driscoll, supra; Stevens v. Paterson & Newark R. Co., 34 N.J.L. 532 (E. & A. 1870).
*454 L. 1869, c. 383, p. 1017, hereinafter referred to as the General Riparian Act, gave statutory recognition to the preemption of an upland owner, but this preemption was a matter of grace and not of right, and the State could grant or lease those subaqueous lands to a person other than the upland owner. American Dock & Improvement Co. v. Trustees for Support of Public Schools, supra; Bailey v. Driscoll, supra; Stevens v. Paterson & Newark R. Co., supra.
The Legislature as well, on occasion, passed special acts chartering corporations "to fill up, occupy, possess and enjoy all lands covered with water fronting and adjoining premises which may now be owned by them and may construct wharves, harbors, piers, slips and other structures * * * provided it shall not be lawful to fill up * * * or construct thereon * * * in front of land or lands of any other person or persons." L. 1846, p. 22. These acts were deemed to grant mere revocable licenses. See Hoboken Land & Improvement Co. v. Mayor, etc., of City of Hoboken, 36 N.J.L. 540 (E. & A. 1873); Katzenbach v. Armstrong Cork Co., 99 N.J. Eq. 32 (Ch. 1926); charter of Long Dock Company, L. 1856, c. 39, p. 67; of American Dock & Improvement Co., L. 1864, c. 392, p. 683.
Prior to the Wharf Act, hereinafter referred to, and absent legislative restriction or the creation of a public nuisance, a riparian owner had, by local custom, a license to appropriate to his own use that portion of the shore between the high and low water lines which adjoined his upland. Upon reclaiming or improving these lands, the upland owner became vested with a fee simple title thereto. Gough v. Bell, supra; American Dock & Improvement Co. v. Trustees for Support of Public Schools, supra; Bailey v. Driscoll, supra; Ross v. Mayor, etc., Edgewater, 115 N.J.L. 477 (Sup. Ct. 1935); Heiney v. Nolan, 75 N.J.L. 397 (Sup. Ct. 1907); Hoboken Land & Improvement Co. v. Mayor, etc., of City of Hoboken, supra. This local custom or common law was codified by the so-called Wharf Act, L. 1851, p. 335; Stevens v. Paterson & Newark R. Co., supra.
*455 This right under the common law or local custom to improve the shore and by reclamation or improvement to obtain title in fee simple was a mere license revocable at the will of the Legislature, which became irrevocable only when the license had been executed and the riparian owner had effected the reclamation or improvement. Before reclamation was actually made, the State might convey its lands to any one, either for public or private use, without making compensation to the riparian owner in front of whose lands the conveyance was made. A similar express reservation to the State was contained in the Wharf Act. Simpson v. Moorhead, 65 N.J. Eq. 623 (Ch. 1904); American Dock & Improvement Co. v. Trustees for Support of Public Schools, supra; Stevens v. Paterson & Newark R. Co., supra.
In 1864 the Legislature adopted "An Act to ascertain the rights of the state and of the riparian owners in the lands lying under the waters of the bay of New York, and elsewhere in the state," L. 1864, c. 391, p. 681. The committee appointed by virtue of this 1864 enactment filed a report dated February 1, 1865, which reads in part as follows:
"But the passage of the law commonly known as the `Wharf act,' of March 18th, 1851, served, we think, as a very decided indication of the policy which the state had determined to establish with reference to the relation of riparian owners to submerged lands.
The Legislature finding that in innumerable instances, by her own sufferance, individuals had acquired title to reclaimed lands in contact with the upland, and that the same thing was sure to occur in countless more cases, gave a general license, in accordance with the prevailing sentiment of the people, in its favor, to all persons to improve in front of their lands to low water mark, and by express terms gave the improvements when made to the improver's own exclusive use.

* * * * * * * *
As was urged in the earlier part of this report, the greatest benefit which the State is to derive from such improvements as alone should be tolerated on any terms, is to arise from the commercial navigation and its incidents, which such improvements will surely stimulate on our shores. Compared with these results, any mere pecuniary compensation upon the sale of these lands would be insignificant. Still when private emolument is to be made from the acquisition of these lands and the advantages and privileges *456 connected with them, it is not amiss that the State should receive a share of the benefit for the use of all her citizens." Report of Commissioners Appointed to Ascertain the Rights of the State and of Riparian Owners to the Lands Lying Under Water, February 1, 1865, pp. 19, 21.
In 1868 the Legislature enacted chapter 248, p. 551, which provided that, for a just and equitable consideration to be determined as set forth therein,
"that the right and title of the state to the land lying between high water mark on the west, the deep water of the Hudson on the east, the centre of south Second street on the north and the centre of south Seventh street on the south in Jersey City aforesaid * * * is granted to said united companies, their successors and assigns, to hold in the corporate name of the said New Jersey Railroad and Transportation company, or otherwise, to have, hold, possess and enjoy * * *." (Italics supplied.)
Said statute further expressly granted permission to the grantee to make improvements such as piers, etc., thereon.
In 1869 the Legislature enacted the United Companies Act, under which plaintiff claims, and on that same day enacted the General Riparian Act. The latter statute reads in part as follows:
"That the bulkhead line or lines of solid filling and the pier lines in the tide-waters of the Hudson river, New York bay, and Kill Von Kull, lying between Enyard's dock, on the Kill Von Kull and the New York state line, so far as they have been recommended and reported to the legislature by the commissioners appointed under the original act, of which this is a supplement, by report bearing date February first, eighteen hundred and sixty-five, are hereby adopted and declared to be fixed and established, as the exterior bulkhead and pier lines between the points above named * * *.
And be it enacted, That the act entitled `An Act to authorize the owners of lands upon tidewaters to build wharves in front of the same,' approved March eighteenth, eighteen hundred and fifty-one, be and the same is hereby repealed, as to the tidewaters of the Hudson river, New York bay and Kill Von Kull, below the line of mean high tide; * * * and without the grant or permission of said commissioners, no person or corporation shall fill in, build upon, or make any erection on, or reclaim any of the land under the tidewaters of this state in New York bay, Hudson *457 river, or Kill Von Kull; * * * provided, however, that neither this section, nor any provision in this act contained, shall in any wise repeal or impair any grant of land under water or right to reclaim made directly by legislative act, or grant or license power or authority, so made or given, to purchase, fill up, occupy, possess and enjoy lands covered with water fronting and adjoining lands owned, or authorized to be owned, by the corporation, or grantee or licensee, in the legislative act mentioned, its, his or their representatives, grantees or assigns, or to repeal or impair any grant, or license, power or authority to erect or build docks, wharves and piers opposite and adjoining lands owned, or authorized to be owned, by the corporation, or grantee or licensee in the legislative act mentioned, its, his or their representatives, grantees or assigns heretofore made, or given directly by legislative act, whether said acts are or are not repealable, and as to any revocable license given by the board of chosen freeholders of a county * * *, the same shall be irrevocable, so far as the land under water has been reclaimed or built upon under such license, at the time that this act takes effect; but as to the future, such revocable license is hereby revoked, and no occupation or reclamation of land under water, without such legislative act, or revocable license, shall divert the title of the state, or confer any rights upon the party who has reclaimed, or who is in possession of the same. * * *
And be it enacted, That no grant hereafter made, extending beyond the line of high-water mark, shall be in force or operation as to so much thereof as extends below said line of high-water mark, until the grantee or grantees shall have paid into the treasury of the state such compensation or rentals, or secured to the state such payment or rentals for the estate in the lands lying below the said line of mean high water mark, contained in and conveyed by such grant or lease as is hereinafter provided."
This statute thereafter made provision for the mechanics of obtaining a grant of lands below the high water line and established the method for computing the consideration to be paid for such a grant or lease.
By this act the Wharf Act, insofar as it affected the tide waters of the Hudson River, New York Bay and Kill Von Kull, was repealed.
In American Dock & Improvement Co. v. Trustees for Support of Public Schools, supra, the court said, in construing the General Riparian Act, as follows:
"The act of 1869 is a general act, designed to facilitate the sale of lands of the state under water simply for public revenue, and indifferently to anyone who desired to purchase. In such a scheme the legislature very properly preferred the owner * * *.
*458 The act of 1869 authorized the riparian commissioners to make grants of land under water which had not been improved, and had not been authorized to be improved under any grant or license protected by the provisions of the act; to designate the lands for which a grant is desired; to fix the price or annual rentals; to certify the boundaries, and to make a conveyance therefor in the name of the state and under the great seal of the state."
By L. 1891, c. 124, p. 216, the Wharf Act was repealed in toto.
In seeking to construe the statute sub judice, the following principles of statutory construction must be employed.
In statutory construction, a word or phrase should be accorded its normal and accepted connotation, except as modified by statutory context. Jamouneau v. Harner, 16 N.J. 500 (1954); Julius Roehrs Co. v. Division of Tax Appeals, 16 N.J. 493 (1954); State by Richman v. Sperry & Hutchinson Co., 23 N.J. 38 (1956).
A legislative grant is strictly construed, and a grantee cannot take anything not clearly given therein. In cases of doubt the grant is construed in favor of the State and against the grantee. Pipe Line Co. v. Delaware, Lackawanna & Western Railroad Co., 62 N.J.L. 254 (E. & A. 1898); Tracy v. Borough of Keansburg, 99 N.J.L. 35 (Sup. Ct. 1923); Townsend v. Brown, 24 N.J.L. 80 (Sup. Ct. 1853); Morris Canal & Banking Co. v. Central Railroad Co., 16 N.J. Eq. 419 (Ch. 1863); City of Passaic v. State, 33 N.J. Super. 37 (App. Div. 1954). See American Dock & Improvement Co. v. Trustees for Support of Public Schools, supra.
Where words in a statute have received a judicial construction, the Legislature will be deemed to have used them in a sense that had been thus ascribed to them. Commercial Trust Co. of New Jersey v. Hudson County Board of Taxation, 87 N.J.L. 179 (E. & A. 1914); Ross v. Miller, 115 N.J.L. 61 (Sup. Ct. 1935); Lynch v. City of Long Branch, 111 N.J.L. 148 (Sup. Ct. 1933).
Statutes in pari materia are construed together. Modern Industrial Bank v. Taub, 134 N.J.L. 260 (E. & A. 1946); Miller v. Board of Chosen Freeholders, Hudson *459 County, 10 N.J. 398 (1952); Phillips v. Board of Adjustment of Town of Westfield, 41 N.J. Super. 549 (Law Div. 1956). This is especially true of statutes adopted on the same day or at the same session of the Legislature. State v. Freulli, 98 N.J.L. 395 (Sup. Ct. 1923).
The public policy of the State, as evidenced by a consistent course of legislation on a given subject matter, may be invoked to ascertain the legislative intent. Conover v. Public Service Ry. Co., 80 N.J.L. 681 (Sup. Ct. 1910). It becomes necessary to analyze the United Companies Act in the light of the foregoing.
In 1869, as above stated, the title to subaqueous tidal lands was in the State. The law recognized only two means of devolution of title from the State, i.e., (1) by grant of the freehold, or (2) by license, power or authority to reclaim and improve, which license could ripen into a freehold estate only upon the accomplishment of the reclamation or improvement. Subsequent to 1851 both the grant and the license were created by act of the Legislature. A grant so made by the Legislature was irrevocable, but a license so made was revocable until it had ripened, as above noted, into a freehold estate. Research has failed to disclose any such license which was irrevocable before such reclamation or improvement. The Legislature, in case of a grant, used specific, apt and appropriate language in its enactments to create a freehold estate and studiously avoided such language in creating a license.
At the time of the adoption of the questioned statute there existed some doubt as to whether a corporation had the power to so reclaim and improve subaqueous lands, absent an express provision in its charter granting it a license to reclaim and improve subaqueous lands adjoining high land owned by it. State v. Brown, 27 N.J.L. 13 (Sup. Ct. 1858).
In L. 1868, c. 248, p. 551, exact and precise language was used to create a freehold estate to the United Companies, and in the United Companies Act exact and precise language was used to create a license. Had it been the intention of the Legislature to create a grant by the United *460 Companies Act, there would have been no need for the enactment. It would have been redundant, since such a result had already been accomplished by L. 1868, c. 248, p. 551, at least insofar as the lands lying in the Hudson River, New York Bay and Kill Von Kull are concerned.
The two acts of 1869 referred to above, being in pari materia and having been adopted on the same day, must be read together. The conclusion is inevitable that the United Companies Act created a mere revocable license. There is absent any language which would distinguish this license from that created either by the common law or the Wharf Act, or would change its nature from revocable to irrevocable. The mere presence of the condition for the payment of a consideration to the State is insufficient to overcome the presumption that it was intended as a license rather than a grant.
The apparent purpose of the United Companies Act was to reserve to the United Companies any license which they might have enjoyed ante 1869; in effect, to save such a license from the repealer of the Wharf Act by the General Riparian Act, and simultaneously to resolve the doubts raised by State v. Brown, supra, and create such a license.
In effect, this act served to amend the charter of the Camden and Amboy Rail Road and Transportation Company by engrafting thereon the right "to reclaim and erect wharves and other improvements in front of any lands now owned by * * * them," with the result that when such lands were "so reclaimed and improved to have, hold, possess and enjoy the same as owners." This resulted in a grant to the Camden and Amboy Rail Road and Transportation Company of powers and rights similar to those enjoyed by the Hoboken Land and Improvement Company under its original charter. L. 1838, p. 92. This charter act, by its fourth section, empowered the Hoboken Land and Improvement Company "* * * to purchase, fill up, occupy, possess, and enjoy all land covered with water fronting and adjoining the lands that might be owned by them, and they may construct thereon wharves, harbours, piers, and slips, and all other structures *461 * * *." In Hoboken Land & Improvement Co. v. Mayor, etc., of City of Hoboken, supra, this was held to create "a mere privilege for reclamation and appropriation to private uses."
The language of the United Companies Act is a paraphrase of the language of the Wharf Act. The Wharf Act, L. 1851, p. 335, reads in part as follows:
"1. * * * That it shall be lawful for the owner of lands, situate along or upon tide waters, to build docks or wharves upon the shore, in front of his lands, and in any other way to improve the same, and, when so built upon or improved, to appropriate the same to his own exclusive use."
The United Companies Act reads in part as follows:
"That the said United Companies shall be and they are hereby authorized to reclaim and erect wharves and other improvements in front of any lands now owned by or in trust for them, or either of them, or by any company in which they now hold the controlling interest, adjoining Kill Von Kull or any other tide waters of this state; and when so reclaimed and improved to have, hold, possess and enjoy the same as owners thereof; * * *."
This comparable phraseology having already received judicial construction, must be deemed used in a sense that had theretofore been ascribed to it, i.e., that such language created a revocable license.
Although reference is normally not made to the preamble of a statute in an attempted construction thereof, such preamble may be considered to ascertain the intent of the statute in aid of its construction when the statute itself is ambiguous. Although there does not appear to be any doubt of the Legislature's intent, if it can be said that the intent as expressed in the body of the United Companies Act is doubtful, then resort may be had to the preamble of that statute. Bass v. Allen Home Development Co., 8 N.J. 219 (1951).
The preamble reads as follows:
"Whereas, the United Delaware and Raritan Canal Company, the Camden and Amboy Railroad and Transportation Company, and *462 the New Jersey Railroad and Transportation Company, have recently secured to this state the payment of five hundred thousand dollars for the grant of lands under water, in front of lands owned by them, and are desirous of having the right and privilege of erecting and making wharves, piers and other improvements in front of other lands now owned by or in trust for them, so that they may safely make such improvements as they may find necessary to facilitate their business * * *."
In express language, the preamble designates that which was created in 1868 as a grant and by implication that which was created in 1869 as something less. The only conclusion is that the Legislature intended to create a license by the latter act.
It further demonstrates a startling difference in consideration to be paid for the grant of 1868 and the license of 1869. For the specifically described land, under the 1868 act the consideration was $500,000. For the balance of all subaqueous lands adjacent to lands owned by the United Companies in New Jersey, the consideration was only $20,000. Considerable difficulty was encountered in locating the maps which were filed pursuant to the terms of the United Companies Act. However, examination of the available records disclosed that there were filed at least 25 such maps, each delineating four parcels of land. Thus it was the intent of the United Companies to claim the benefits of said act for at least 100 separate parcels of land. The respective considerations are striking in their disparity. Surely the legislative intent under the United Companies Act must have been to create something less than a freehold estate, since the Legislature had already shown its awareness of the true value of a grant in fee.
The theory behind the common law rights of a riparian owner and the rights under the Wharf Act was a desire to promote coastal improvements and to stimulate industry and commerce. Report of Commissioners Appointed to Ascertain the Rights of the State and of Riparian Owners to the Lands Lying Under Water, February 1, 1865.
It cannot be concluded that the Legislature intended to make a freehold grant or some lesser grant in perpetuity to *463 the United Companies so that they might speculate upon the increased value thereof, and leave the land to lie fallow. The preamble of the United Companies Act, in express language, provides that "they may safely make such improvements as they may find necessary to facilitate their business." This does not connote an intention to grant an irrevocable license in perpetuity for speculative purposes. Here 88 years have intervened without any such improvements. This would seem more than adequate time for the licensees to make improvements "necessary to facilitate their business."
It is therefore held that the United Companies Act (L. 1869, c. 386, p. 1026) granted a revocable license.
The history of the treatment of title to subaqueous tidal lands by the State exhibits a definite purpose to restrict its use and appropriation by the public. The initial colonial desire to stimulate coastal improvements for the benefit of the State at large by permitting the developer to reap the sole financial benefits underwent a drastic and complete change with the passage of time. The consistent course of legislation exhibits an intent to establish a public policy in connection with the private improvement of subaqueous lands. As the law developed it became clear that such improvements to subaqueous lands could be made only by the purchase of a freehold estate from the State for a valuable consideration. This resulted, to some extent, in a participation by the State in the anticipated profits of such a venture. Licenses for reclamation and improvement were terminated. Grants of the freehold were only upon the payment to the State of an adequate and valuable consideration.
"A license, pure and simple, is a mere personal privilege * * *. Even when money has been paid for it, it is revocable at law, at the pleasure of the licensor." East Jersey Iron Co. v. Wright, 32 N.J. Eq. 248 (Ch. 1880).
The common law right to a license was ended by the passage of the Wharf Act. The Wharf Act was repealed *464 in part by the General Riparian Act, and in its entirety by L. 1891, c. 124, p. 216. As a result of the latter act, all rights to a license to make future improvements or reclamation, whether created by general or special act, which existed before 1891, were repealed. Katzenbach v. Armstrong Cork Co., 99 N.J. Eq. 32 (Ch. 1926), affirmed 102 N.J. Eq. 333 (E. & A. 1928). Further support for the establishment of a public policy to revoke all such licenses theretofore given is found in L. 1894, c. 71, p. 123; L. 1903 (2d Sp. Sess.), c. 1, p. 63 (N.J.S.A. 18:10-5). The license under the United Companies Act now stands revoked.
It is difficult to conceive, as plaintiff argues, that the United Companies Act, if it did not create an irrevocable license, created an "option." However, if this were conceded merely for the purpose of these conclusions, plaintiff is still confronted with an insurmountable obstacle.
Where no time is fixed for the performance of a contract, the law is settled that by implication a reasonable time was intended. Aboczky v. Stier, 126 N.J.L. 109 (Sup. Ct. 1941). This is true of contracts for the purchase of land, Lean v. Leeds, 92 N.J. Eq. 455 (E. & A. 1921), and options for the purchase of lands, Durepo v. May, 73 R.I. 71, 54 A.2d 15, 172 A.L.R. 429 (Sup. Ct. 1947).
Under an option to purchase lands, no estate therein passes. The purchaser (optionee) acquires merely an inchoate right to the land which will be protected in equity. Bright v. Forest Hill Park Development Co., 133 N.J. Eq. 170 (Ch. 1943).
Under the statute, the sole performance which could have been required of the Camden and Amboy Rail Road and Transportation Company was the completion of one or more of the improvements therein enumerated. No specific time having been specified, a provision for such construction within a reasonable time should be implied. The failure of plaintiff or its predecessors in title to have so performed for 88 years is an unreasonable delay. In any event, since plaintiff had no estate in the lands, but a mere inchoate *465 right thereto upon performance of the condition, equity will refuse to interfere to protect a right which has lapsed because of the purchasers' non-performance. Therefore, if it be considered that plaintiff ever had an option, it is now unenforceable.
Plaintiff relies upon City of Hoboken v. Pennsylvania R. Co., 124 U.S. 656, 8 S.Ct. 643, 31 L.Ed. 543 (1887), for authority that the United Companies Act created a grant rather than a license. A consideration of this opinion and its effect becomes essential. The court, in this case, did not predicate its conclusion upon the authority of a prior construction by New Jersey courts, but rather treated the question as res nova.
The courts of a state are not bound by decisions of the United States Supreme Court in determining the construction and interpretation of a statute of such state. In Tennessee Enamel Mfg. Co. v. Stovers, Inc., 192 F.2d 863, 869 (U.S.Ct. App. 6 Cir. 1951), certiorari denied 342 U.S. 946, 72 S.Ct. 561, 96 L.Ed. 704 (1952), the court said:
"The rule established by the Supreme Court in Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, is that, in diversity of citizenship cases, the federal courts, when deciding questions of conflict of laws, must follow the rules prevailing in the states in which they sit. Independent decision upon our own reasoning and upon the authority of federal decisions on a question of conflict of laws having been thus curtailed, we are reduced to the position of mere annotators of state law. An annotator is, of course, not empowered to speak with the authority of an unrestrained court in construing, distinguishing, or applying opinions apparently in conflict. Interpretation of state law by a United States Court of Appeals may be repudiated by the courts of the state whose laws are being construed. Our opinions in this field of state law, therefore, have no binding authoritative effect. Of course, we are compelled by the doctrine of Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, in diversity of citizenship cases, to be annotators of state law where such annotation is necessary to decision. But where it is unnecessary to decision, we are unwilling to assume the unenviable role for an appellate court of the United States of having our pronouncements put in jeopardy of being declared incorrect by a state court inferior to the highest court of the state. Thus far we strive to uphold the innate dignity of a federal appellate court."
*466 See also In re White, 18 N.J. 449 (1955); Union Pac. R. Co. v. Weld County, 247 U.S. 282, 38 S.Ct. 510, 62 L.Ed. 1110 (1917).
Although we are not bound by this opinion, since it does not rise to the dignity of stare decisis, some analysis should be made of its conclusions, as it is at least entitled to respectful consideration as respectable authority. However, I disagree with that court's conclusion for the following reasons:
That case involved two different classes of lands: (1) those claimed by the defendants other than the Pennsylvania Railroad Company which were the subject of confirmatory grants under section 4 of the General Riparian Act, and (2) those claimed by the Pennsylvania Railroad Company under or by virtue of the United Companies Act.
We are not concerned with the rights of the parties as concerns the lands in group (1). Those lands are distinguishable in a primary manner from the lands here in question because of the existence of a confirmatory grant covering the former.
The second group presents a problem, for in deciding the rights of the Pennsylvania Railroad Company the court construed the United Companies Act. In construing that statute the court was faced with these problems:
1. Were the United Companies the owners of upland in front of which lay the property in question? The answer, as given, was that the intent of the Legislature was to include the subject lands in the statute.
2. What was the nature of the interest secured by the payment of the $20,000? The court, construing the statute, declared the purpose was (1) to confirm the title of the United Companies to their lands, wherever situate in the State, and (2) to define the purposes for which those lands could be used.
The lands had been improved and reclaimed, as provided in said act, and it is against this factual backdrop that the court construed the United Companies Act. The conclusions of the court which were necessary to a resolution of the *467 problem before the court are not dicta (even though those conclusions are not binding upon this court). That court was placed in the unenviable position of construing a state statute without benefit of a prior construction by a state court. But certainly, insofar as the conclusions go beyond what was necessary for a resolution of the problem at hand, the decision of that court is, in any event, not only not binding, but that conclusion is not even authority, it being mere obiter dicta.
Under the facts there present, the same result would have eventuated as that found by the court if it had merely bottomed its conclusions upon the completion of the reclamation and improvements. It was unnecessary to go to the extent of construing the statute to ascertain what title, if any, would have eventuated had no such reclamation or improvements been accomplished.
Although the court did not use the legal expression "in pari materia" it is apparent that it considered the two acts of 1869 in that relationship.
As above indicated, the Wharf Act, the Hoboken Land and Improvement Company charter, and the United Companies Act, to all intents and purposes, each paraphrase the language of the other.
Although the court recognized that the Hoboken Land and Improvement Company, under its charter, had only a revocable license to reclaim and improve, it found that the United Companies Act, by comparable language, created a grant in fee. No effort was made to distinguish these acts or to demonstrate why they should not be read together, correlated and made to establish one systematic treatment of the subject matter, resulting in the conclusion that they each created a mere license.
The court said [124 U.S. 656, 8 S.Ct. 655]:
"Having in view the manifest policy of this legislation, and the force and meaning of its language, we do not hesitate to adopt the conclusion that the several grants of the state to the united companies, under the act of March 31, 1869, to enable them to improve their lands under water at Kill Von Kull and other places, *468 and the grants under the general act of the same date, under which the other defendants claim, were intended to secure to the grantees the whole beneficial interest and estate in the property described, for their exclusive use, for the purposes expressed and intended in the grants; and, construing these conveyances most strongly in favor of the public, and yet so as not to defeat the grants themselves, we also conclude that the rights conveyed exclude every right of use or occupancy on the part of the public in the land itself. The land granted is specifically described by metes and bounds. The grant is a grant of the estate in the land, and not of a mere franchise or incorporeal hereditament. The uses declared are such as require an exclusive possession by the grantees, that they may hold, possess, improve, and use the same for their own use and profit, according to the nature of the business which by law they are authorized to conduct. In other words, under these grants the land conveyed is held by the grantees on the same terms on which all other lands are held by private persons under absolute titles, and every previous right of the state of New Jersey therein, whether proprietary or sovereign, is transferred or extinguished, except such sovereign rights as the state may lawfully exercise over all other private property."
The court ignored the all-important condition in the United Companies Act which had to be complied with prior to the vesting of title. The court did not consider or discuss the contingency that the fee title, under the terms of the statute, did not vest until reclamation or improvement had been accomplished. The conclusion that "the grant is a grant of estate in the land, and not of a mere franchise or incorporeal hereditament" is based neither upon legal reasoning nor authority. It is a bold statement which does not take into consideration either other statutes which stand in pari materia, e.g., the act of 1868 or the common law which preceded these acts. No exhaustive treatment of the law as it existed ante 1869 is attempted, nor is there attempted any rational reconciliation of other statutes, existing or repealed, to attempt to discover the underlying purpose of the statute under consideration.
Again, the court said "The uses declared are such as require an exclusive possession by the grantees, that they may hold, possess, improve, and use the same for their own use and profit * * *." There can be, generally, no dispute *469 of this statement if taken out of context. But the manner in which the conjunction "and" was used between the words "improve" and "use" gives rise to a false conclusion in the light of the problem before the court. Specifically, the statement is correct if it refers to the right to reclaim and improve. However, just as under the common law, Wharf Act, and various corporate charters, it was not necessary that the grantee enjoy a fee in the subaqueous lands to "hold, possess, improve, and use" by reclamation and improvement, so it was not necessary that the United Companies should be seized of a fee for that purpose. The "exclusive possession" could arise from a license or franchise as well as from a fee title. If the court intended the words "hold, possess * * * and use" to connote the lands after they had been reclaimed and improved and were actually or in effect no longer subaqueous but rather highland, the conclusion is uncontrovertible that they must have a fee. This is the identical situation which eventuated under the common law, Wharf Act and charter acts, i.e., title in fee came into being only after the reclamation and improvement of subaqueous lands.
From this fallacious premise the court reaches the following conclusion: That the lands were held "on the same terms on which all other lands are held by private persons under absolute titles."
There is no doubt that this follows after the requisite reclamation or improvement has been accomplished. As has been above demonstrated, this was the law prior to 1869 either by virtue of the common law or by virtue of the Wharf Act, but it was only upon such reclamation or improvement that "every previous right of the state of New Jersey therein, whether proprietary or sovereign, is transferred or extinguished." The court completely ignored the condition precedent to a vesting of title. Its conclusion is a non sequitor.
It ignored as well the advisedly used language of the 1868 act which aptly expressed a grant in fee. Such language is missing in the United Companies Act.
*470 The court used the preamble of the United Companies Act which referred to the 1868 act, as indicative of an intention to create a like estate to that created in 1868. In this the court erred. The preamble is not a part of the statute, and may be resorted to only where the language of the statute itself is ambiguous. Bass v. Allen Home Improvement Co., supra. The language of the statute is unambiguous.
In statutory grants the grantee can take nothing not clearly given by the grant. Such an act must be most clearly construed in favor of the State and against the grantee. Although the court cited this principle, it proceeded to ignore it in applying the law both as to the sources to which reference may be had in construing statutes containing doubtful language and the effect of the absence of such language. It sought, in effect, to make the United Companies Act amendatory of the 1868 act by having the same result eventuate as accrued under the 1868 act, i.e., a grant in fee, and yet failed to explain the difference in terms, words and phrases and the reason or necessity for a separate act  not specifically amendatory of the 1868 act. Unless the United Companies Act intended a separate and distinct estate from that created by the 1868 act there was no sense or reason for using different language in a distinct and separate statute which, although referring to the 1868 act in its preamble, was not amendatory of that act.
For the foregoing reasons, City of Hoboken v. Pennsylvania Railroad Company, supra, is neither binding upon this court nor dispositive of the legal issues here involved.
It is therefore here held that the license originally granted to plaintiff has been revoked, and that it has no title to the lands here involved.