51 N.J. Super. 447 (1958)
144 A.2d 180
RIVER DEVELOPMENT CORP., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
THE LIBERTY CORPORATION, A CORPORATION OF THE STATE OF PENNSYLVANIA, DEFENDANT-RESPONDENT, AND GROVER C. RICHMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, AMICUS CURIAE.
Superior Court of New Jersey, Appellate Division.
Argued January 13, 1958.
Supplemental Briefs filed March 7, 1958.
Decided July 16, 1958.
*452 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Louis B. LeDuc argued the cause for appellant.
Mr. Josiah E. DuBois, Jr., argued the cause for respondent (Messrs. DuBois & DuBois, attorneys).
Mr. David D. Furman, Deputy Attorney-General, argued the cause for the State of New Jersey, amicus curiae (Mr. Grover C. Richman, Jr., Attorney-General, attorney; Mr. Sidney Kaplan, Deputy Attorney-General, on the brief).
Mr. Edward J. O'Mara argued for the Pennsylvania Railroad Co., amicus curiae.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This action was brought to determine the rights of the respective parties to land under the tidal waters of the Delaware River known as Fisher Cove, in Pennsauken Township, Camden County, New Jersey, and to quiet title to that land. Additionally, plaintiff sought an injunction against defendant's dredging operations in the cove.
Plaintiff claims by reason of an act of 1869 (c. 386) which authorized the Camden and Amboy Railroad and Transportation Company and two other utilities to reclaim and improve lands under tidewater fronting on uplands owned by *453 them and to take title to the lands so reclaimed and improved. Among the properties allegedly benefitted by this act was a 1,000-foot strip of upland along Fisher Cove in the Delaware River north of Camden. In August 1955 this right of reclamation, still unexercised, was conveyed by the railroad company (then consolidated with the two other utilities under the name of The United New Jersey Railroad and Canal Company) to plaintiff River Development Corporation, which had been organized for the purpose of converting submerged lands into industrial sites. In the fall of 1956, and before plaintiff had embarked upon any improvement in Fisher Cove, defendant Liberty Corporation sent its dredging equipment into the cove and proceeded to remove underwater sand and gravel. Plaintiff then instituted this action and obtained a temporary restraining order. The parties entered into a stipulation that defendant would not dredge in the underwater area claimed by plaintiff until the Chancery Division had determined that the dredging did not interfere with any right, title or interest of plaintiff.
The Attorney-General appeared as amicus curiae at the request and for the assistance of the court in its consideration of the riparian law of the State and the legislative grant in L. 1869, c. 386. He introduced no evidence but in his brief claimed that the 1869 act gave only a license to reclaim the submerged lands, revocable at any time by the State, and that such revocation was effected by L. 1894, c. 71.
As against plaintiff's demand for judgment adjudicating its rights in Fisher Cove, for a permanent injunction restraining defendant Liberty Corporation from its dredging operations, and an accounting for profits and damages for the sand and gravel already dredged, defendant claimed that (1) the Camden and Amboy Railroad and Transportation Company acquired no rights in the submerged lands in question because it failed to comply with the conditions attached to the statutory grant of 1869 in that it was not the riparian owner of Fisher Cove at the time of the grant, and the map and description filed by it with the Secretary of State did not meet the requirements of the statute, the *454 one-dimensional map not being a map in the statutory sense, and the call to "deep water" in the description being too indefinite for location; (2) if the right to reclaim vested in the railroad, it was thereafter revoked or terminated; (3) the right had been abandoned; (4) the railroad's deed to plaintiff was invalid because the right to reclaim depended upon continued riparian ownership and could not be transferred in gross and, further, the deed was void because not legally approved by the Board of Public Utility Commissioners; (5) in any event, plaintiff's right to reclaim did not extend outstream more than 1,700 to 1,800 feet from the high water line of 1869; and (6) if plaintiff acquired any right to reclaim, it was a non-exclusive right until exercised and did not preclude defendant's dredging prior to plaintiff's reclamation.

I.
The Camden and Amboy Railroad Transportation Company was incorporated by special act of the Legislature in 1830 for the purpose of building a railroad between Camden and South Amboy (L. 1830, p. 83). Section 11 of its charter authorized the company to survey, lay out and construct such railroad, with all necessary appendages, provided that the road or its branches should not exceed 100 feet in width. The initial survey was made by Lt. William Cook of the U.S. Artillery whose field notebooks are in evidence, the first two covering the survey between Camden and South Amboy completed in December 1830, and the third covering the relocation survey completed in April 1833.
Title to the portion of the railroad abutting Fisher Cove was obtained by deed from William Folwell and wife to the company under date of November 22, 1831. The description in this deed locates the land conveyed as "so much of the lands of the said party of the first part situate in the Township of Waterford in the County of Gloucester in the State of New Jersey, over which the line of said Rail Road is now laid out and located as may be necessary for the *455 use and construction of the said Road * * *." The deed continues:
"* * * the line of said Road when completed not to exceed fifty feet in width through and across the farm of the said party of the first part situate near Coopers Creek [now in Camden, New Jersey] and running from William Coopers line, to the line of Joseph Gardiner and Joseph W. Cooper, and from thence to include a road of twenty five links in width to the said Folwells other land purchased by him of the said Joseph Gardiner, and the said line not to exceed one hundred feet in width through and across the other farms of the said party of the first part, lying on the River Delaware when completed as aforesaid, TOGETHER with all and singular the ways water rights liberties privileges and appurtenances thereto * * *."
These lands are situate in what is now Pennsauken Township, Camden County. Plaintiff's claim of right in Fisher Cove as an upland owner springs from this deed. It contends that the line of the right-of-way granted by Folwell bordered the Delaware River for the entire 1,000-foot length in question. Defendant disputes that the description in the Folwell deed included the high water mark. Much of the testimony and many of the exhibits were addressed to this phase of the case.
Not long after its organization, the Camden and Amboy entered into an informal consolidation or "active union" with its potential competitor, the Delaware and Raritan Canal Company, incorporated the same day. They agreed they would jointly complete and operate their respective projects. Burgess and Kennedy, Centennial History of the Pennsylvania Railroad Company, 1846-1946, pages 245, 251 (1949). Later another competitor, the New Jersey Railroad and Transportation Company, was absorbed into the union, the three companies sharing their issued stock and having a common board of directors. Ibid., pages 262, 263. This group became known as The United New Jersey Railroad and Canal Company (familiarly "The United Companies") and was so recognized in a number of our statutes. One of the more important of such laws is chapter 248 of the Laws of 1868 granting "the right and title of the state to the land lying between high water mark on the west, the *456 deep water of the Hudson on the east, the center of south Second Street on the north and the center of south Seventh Street on the south in Jersey City," except for the so-called Budd grant, to The United Companies, their successors and assigns, to hold in the corporate name of New Jersey Railroad and Transportation Company. This is known as the Harsimus Cove grant. Authority was given the grantee to fill up and improve the property with wharves, storehouses, depots, shops, etc., and to extend bulkheads, solid filling and piers to the exterior lines adopted for those purposes by the commissioners appointed under L. 1864, c. 391, or to such other exterior lines as might thereafter be established by or under the authority of the Legislature. The United Companies were to pay the State Treasurer such sum as might be fixed by the Attorney-General and three commissioners. They eventually fixed the purchase price of Harsimus Cove at $500,000, and their report was accepted by The United Companies.
The following year the Legislature enacted L. 1869, c. 386, hereinafter referred to as The United Companies Act, under which plaintiff claims. We reproduce it in full:
"Whereas, the United Delaware and Raritan Canal Company, the Camden and Amboy Railroad and Transportation Company, and the New Jersey Railroad and Transportation Company, have recently secured to this state the payment of five hundred thousand dollars for the grant of lands under water, in front of lands owned by them, and are desirous of having the right and privilege of erecting and making wharves, piers and other improvements in front of other lands now owned by or in trust for them, so that they may safely make such improvements as they may find necessary to facilitate their business; therefore,
Be It Enacted by the Senate and General Assembly of the State of New Jersey, That the said United Companies shall be and they are hereby authorized to reclaim and erect wharves and other improvements in front of any lands now owned by or in trust for them, or either of them, or by any company in which they now hold the controlling interest, adjoining Kill Von Kull or any other tide waters of this state; and when so reclaimed and improved to have, hold, possess and enjoy the same as owners thereof; provided, that such improvements shall be subject to the regulations (where applicable) as to the line of solid filling and as to pier lines heretofore recommended in the report of the commissioners made and filed under the *457 act entitled `An act to ascertain the rights of the state and of the riparan [sic] owners in the lands lying under the waters of the bay of New York and elsewhere in this state,' approved April eleventh, eighteen hundred and sixty-four, but neither said improvements nor those which may be made by said companies in Harsimus Cove shall be subject to any other restrictions than those contained in said report; and provided further, that the said United Companies shall, on or before the first day of July next, pay to the treasurer of this state the further sum of twenty thousand dollars in full satisfaction for the right and privilege hereby granted; and provided further, that the said United Companies shall on or before the said first of July, file in the office of the secretary of state a map and description of the lands under water in front of the upland referred to in this section."
The $20,000 consideration called for by chapter 386 was thereafter paid to the State, and a quadrant of the map and a description of the lands here involved filed with the Secretary of State. The original map and description are reproduced in the Chancery Division opinion appearing in 45 N.J. Super. 445, at page 451. The description refers to lands lying under the tide waters of the Delaware River in Stockton Township, Camden County, "granted" to the United Delaware and Raritan Canal Company, Camden and Amboy Railroad and Transportation Company and New Jersey Railroad and Transportation Company by act of the Legislature, approved March 31, 1869, i.e., c. 386, and continues:
"The said lands under water so granted lie in front of the uplands adjoining said River belonging to the Camden and Amboy Railroad and Transportation Company: Beginning at high water mark on the division line between said uplands and the land owned by James M. Chapman and running thence in a North Easterly direction along the high water line of said River and along the said uplands one thousand feet more or less to other land of the said James M. Chapman, and the lands so granted extend in a North Westerly direction from the said high water line to the deep waters of the said Delaware River."
It will be noted that chapter 386 of the Laws of 1869 imposed a limitation upon the extent of its authorization to reclaim and improve outstream by requiring that it "shall be subject to the regulations (where applicable) as to the line of solid filling and as to pier lines heretofore recommended *458 in the report of the commissioners" appointed under the act of April 11, 1864 (L. 1864, c. 391). The commissioners' report, however, was confined to the Hudson River and adjacent waterways; no line for solid filling or bulkhead or pier lines had been established in the Delaware at the time the 1869 act was adopted.
Fisher Cove in 1869 was a moderate concavity in the eastern shoreline of the Delaware River. In 1886 the United States Corps of Engineers completed the erection of a wide stone dike, known as Fisher Dike, beginning at the northerly extremity of the cove near Fisher Point and extending some 3,000 feet downstream and close to the main channel of the river. The cove is bordered by a steep bank rising between 25 and 40 feet to a plateau on which there has lately been extensive urban construction. The bank is a natural feature, not man-made. The railroad right-of-way and tracks are located on a shelf built half-way up the bank.
On June 30, 1871 The United Companies leased all their property and franchises to the Pennsylvania Railroad Company for a term of 999 years. The next year the Legislature authorized the formal consolidation of the Camden and Amboy, Delaware and Raritan, and New Jersey Railroad and Transportation companies. L. 1872, c. 223. The consolidation was effected soon thereafter, the new company taking the corporate name of "The United New Jersey Railroad and Canal Company," L. 1872, p. 1402. All assets of the three companies were transferred to this new entity, including whatever rights Camden and Amboy had in Fisher Cove, sometimes designated in the testimony as Parcel C.
On August 12, 1955 The United New Jersey Railroad and Canal Company conveyed to plaintiff "all its estate, right, title and interest" of, in and to the lands under water bordering the 1,000 feet of shore frontage on Fisher Cove and extending westwardly to the U.S. Bulkhead and Pierhead Line of the Delaware River as established in 1940, the high water line running northeast as well as southwest to lands formerly of James M. Chapman. The line of upland is located and described by metes and bounds. The *459 recited consideration for the deed is $1,000; attached is a quitclaim by the Pennsylvania Railroad Company, lessee of The United Companies. The conveyance received the approval of the New Jersey Board of Public Utility Commissioners.
It is conceded that the right to reclaim given by the 1869 act has never been exercised insofar as the lands involved in this litigation are concerned.

II.
The Chancery Division, after a comprehensive review of the record and the riparian law of the State of New Jersey as developed by the Legislature and the courts, held that plaintiff's predecessor in title, The United Companies, received only a revocable license to the subaqueous lands in front of their Fisher Cove property from the State under The United Companies Act, L. 1869, c. 386; and further, that the license was revoked by virtue of L. 1891, c. 124. The court found support for the establishment of a public policy to revoke all licenses of like nature theretofore given, in L. 1894, c. 71, as maintained by the State. River Development Corp. v. Liberty Corp., 45 N.J. Super. 445 (1957). The trial judge consequently entered final judgment declaring that the State of New Jersey has unencumbered title in fee simple to the submerged lands in question and the right to license defendant to dredge any such lands, and that plaintiff has no right, title or interest therein.
After the entry of final judgment, the Pennsylvania Railroad Company, acting for itself as lessee and for The United New Jersey Railroad and Canal Company as grantor, filed a verified petition in this court for leave to appeal or, in the alternative, that its counsel be permitted to appear as amicus curiae and file a brief in support of its contention that the judgment below be reversed and to present oral argument in support of its position. The petition reflected the applicant's belief that the judgment of the Chancery Division rendered uncertain not only plaintiff's title to the *460 submerged lands in question but also the title of other grantees similarly derived from The United New Jersey Railroad and Canal Company through The United Companies Act of 1869, as well as the titles to submerged lands still held by The United Companies. All of the parties consenting thereto, we entered an order granting the alternate relief requested, so that we have before us not only the briefs of plaintiff and defendant but those filed on behalf of the State and of the Pennsylvania Railroad Company, as amici curiae.

III.
In colonial days title to tide-flowed lands below high water mark within the limits of New Jersey were in the English Crown. Following the Revolution, title was deemed vested in the State. Arnold v. Mundy, 6 N.J.L. 1 (Sup. Ct. 1821); Martin v. Waddell's Lessee, 16 Pet. 367, 41 U.S. 367, 10 L.Ed. 997 (1842) (also reported in 18 N.J.L. 495 (Sup. Ct. 1842)); Bell v. Gough, 23 N.J.L. 624 (E. & A. 1852); Schultz v. Wilson, 44 N.J. Super. 591 (App. Div. 1957), certification denied 24 N.J. 546 (1957). These tide-flowed lands were held under the guardianship of the Legislature and were subject to express grant by statute of a freehold or lesser estate to any grantee, whether or not owner of the adjacent uplands. Stevens v. Paterson and Newark R.R. Co., 34 N.J.L. 532 (E. & A. 1870); Ross v. Mayor, etc., of Borough of Edgewater, 115 N.J.L. 477 (Sup. Ct. 1935), affirmed 116 N.J.L. 447 (E. & A. 1936), certiorari denied 299 U.S. 543, 57 S.Ct. 37, 81 L.Ed. 400 (1936); and see P.L. 1832, p. 15; P.L. 1837, p. 13; P.L. 1837, p. 64; L. 1868, c. 248 and L. 1869, c. 383 for examples of statutory grants.
Although under the English law an upland owner had no right to improve the lands between high and low water fronting his property (to do so constituted a purpresture), there arose in this State the custom that a riparian owner, by reclaiming or improving that portion of the shore between *461 the high and low water marks in front of his property, became the absolute owner thereof. This practice seems to have had the tacit acquiescence of the Legislature and became part of what has been termed "local common law" or "local custom." Bell v. Gough, above, 23 N.J.L. at pages 662, 668; Bailey v. Driscoll, 19 N.J. 363, 369 (1955). The privilege of reclaiming tide-lands held by upland owners was sometimes provided by special acts of the Legislature giving a particular corporation the authority to build and maintain a dike or wharf in front of its uplands, beyond the low water mark but not to extend outward so as to interfere with navigation. During the mid-1800's there were many such special legislative grants of licenses to reclaim or fill in. Such privilege was also included in special acts chartering many companies. See, for example, L. 1856, c. 39; L. 1864, c. 392.
The first express legislative recognition of what had been adopted by the courts as the local common law or local custom was the Wharf Act of 1851, p. 335, codifying that law by vesting an upland owner with the express right to "build docks or wharves upon the shore, in front of his lands, and in any other way to improve the same and, when so built upon or improved, to appropriate the same to his own exclusive use." The owner could build docks, wharves and piers beyond the limits of ordinary low water, but not so as to interfere with public navigation, upon license obtained for that purpose from the county freeholder board; the license was to be recorded and the improvement carried out within five years from its date. The license was not assignable except with and as appurtenant to the uplands. Section 8 provided that nothing in the act was to prevent the State, before any improvement was actually made, from appropriating the submerged lands for public use.
The growing industrial and commercial economy of New Jersey focused attention on the value of subaqueous lands in the navigable waters of our State. By L. 1864, c. 391, the Legislature provided for the appointment of commissioners to survey the lands lying under the waters of New *462 York Bay, Hudson River, the Kill von Kull, Newark Bay, Arthur's Kill, Raritan Bay and the lands lying under the waters of the Delaware River opposite Philadelphia County, to ascertain the State's rights in the same and the value thereof, and to fix and establish exterior lines. They were directed, among other things, to recommend to the Legislature "such plans and provisions for the improvement, use, renting or leasing of the said lands under water as they shall deem necessary for and most conducive to the interest of the state," and to prepare and submit maps exhibiting the exterior lines fixed. The commissioners filed their report under date of February 1, 1865, which, however, was confined to the northern waterways and did not touch the Delaware.
It was not until 1869 that the Legislature, by L. 1869, c. 383 (a supplement to L. 1864, c. 391, and commonly called the General Riparian Act) approved the bulkhead and pier lines fixed by the commissioners in the tidewaters of the Hudson, New York Bay and Kill von Kull. Section 3 expressly repealed the Wharf Act of 1851 insofar as it applied to the tidewaters of the Hudson River, New York Bay and Kill von Kull, and carried the important proviso that nothing in the act should in any wise repeal or impair any grant of land under water or right to reclaim made directly by legislative act, or grant or license to fill up, occupy and possess subaqueous lands fronting property owned by a corporation, grantee or licensee under the Wharf Act of 1851, or any grant or license to erect docks, wharves and piers opposite and adjoining such lands under the 1851 law. Chapter 383 also set up a method of disposing of state-owned lands under water by sale or by lease with an option to purchase. Significantly, the board entrusted with administering the act was not vested with power to grant any estate other than a fee or leasehold.
In 1891 the Legislature passed chapter 124 repealing the Wharf Act of 1851 for the whole State, and forbidding filling in below high water throughout the State except with the grant or permission of the commissioners.

*463 IV.
We deal first with defendant's claim that plaintiff acquired no rights in the submerged lands in Fisher Cove through its predecessor in title under L. 1869, c. 386, because it had failed to establish (1) the exact location of the lands conveyed by Folwell to Camden and Amboy in 1831; (2) that those lands bordered on Fisher Cove in 1869; (3) the exact location of the lands covered by the map and legal description filed by The United Companies with the Secretary of State in 1869, in accordance with the statute; (4) that the portion of the high water line of 1869 intersecting the lands included in the 1831 Folwell deed is the same as the portion of that high water line identified in the map and description filed with the Secretary of State; and finally (5) that the lands covered by the map and description are the same as described in the complaint and pretrial order. Plaintiff, on the other hand, argues that the railroad right-of-way extended to and within tidal water, and that the map and description filed with the Secretary of State complied with the statute. We are not persuaded that plaintiff has fully established its case in either regard. However, like the trial court, we deem it necessary to treat only of the nature of the right in lands under water granted by The United Companies Act of 1869, and will assume for the purpose of our determination that the railroad lands did border on Fisher Cove and that the map and description filed with the Secretary of State fully met the requirements of the act.

V.
Plaintiff does not claim that the 1869 act gave The United Companies a fee simple title to the subaqueous lands in question, but maintains that the statute did give the railroad "a vested right to secure such a fee simple upon its reclamation of the submerged land"  that it obtained "an indefeasible right to secure such a title." The right so secured under the statute is variously described as "an estate in futuro * * * sometimes called an estate on executory limitation"; *464 more exactly, "a springing use"; and plaintiff also calls upon the analogy of a real estate option because the "performance of the condition precedent by which the fee was to vest in the grantee, is wholly in the grantee's hands," and such a right, supported by a valuable consideration, is indefeasible and irrevocable, unlimited in time, and may be transferred or devised. Defendant contends that the right given plaintiff's predecessor was not one that vested an irrevocable legal title or interest in the subaqueous soil, but was nothing more than a revocable license. The Attorney General joins in this view.
Plaintiff's argument is contrary to the established law of this State prior to 1869, as well as since, in fixing the rights of upland owners under the common law or under specific grants of legislative license to reclaim or improve abutting submerged lands. As the trial court correctly held, the right under the local common law or local custom to improve the shore and by reclamation or improvement to obtain title in fee simple, was a mere license revocable at the will of the Legislature. It became irrevocable only when the license had been executed and the riparian owner had effected the reclamation or improvement. Before that was done, the State might convey its lands to anyone, either for public or private use, without making compensation to the riparian owner in front of whose lands the conveyance was made. State v. Mayor, etc., of City of Jersey City, 25 N.J.L. 525, 527 (Sup. Ct. 1856) (Elmer, J., in which he comments upon Gough v. Bell, 22 N.J.L. 441 (Sup. Ct. 1850), affirmed in Bell v. Gough, 23 N.J.L. 624 (E. & A. 1852)). Legislative expression in the form of the Wharf Act of 1851, and the findings of the first riparian commissioners in their report of February 1, 1865, pages 19, 21, conform to the opinions in Bell v. Gough and State v. Mayor, etc., of City of Jersey City; while an upland owner enjoyed an exclusive right to reclaim or improve in front of his lands, that right was subject to divestment by the Legislature at any time before its exercise. L. 1869, c. 386 was enacted against this legal background.
*465 Plaintiff asserts that the trial court misapprehended the state of the law in New Jersey prior to 1869. Not so. Referring to the Wharf Act of 1851, our former Court of Errors and Appeals, speaking through Chief Justice Beasley in Stevens v. Paterson and Newark R.R. Co., 34 N.J.L. 532, 547 et seq. (E. & A. 1870), decided the year following the passage of chapter 386, definitively held:
"* * * I think it is evident that from the date of the decision of Gough v. Bell up to the time of the present controversy, the question now under consideration has not been considered an open one by the courts of this state. And such, too, appears to have been the legislative and public understanding of the effect of this leading decision just mentioned, at the time that it was rendered. This, I think, is manifest from the provisions of the act of 1851 [the Wharf Act], entitled `An act to authorize the owner of lands upon tide waters to build wharves in front of the same.' Nix. Dig. 1025. By the first section of this act it is declared `that it shall be lawful for the owner of lands situate along or upon tide waters to build docks or wharves upon the shore in front of his lands, and in any other way to improve the same, and when so built upon or improved, to appropriate the same to his own exclusive use.' Thus we find in this provision, and in similar provisions in many other laws, the local custom sanctioned in the case of Gough v. Bell assuming a statutory form and subject to certain general regulations. The right of the bank-owner was dealt with by the legislature not as an incident of property already vested, but as a privilege which required the element of public acquiescence, and the performance of a pre-requisite on the side of the proprietor, to be converted into a legal right. * * * The bank-owner has, by the local custom of the state, but an inchoate right before the reclamation of the land below the water; nor does he gain anything in this respect by the statute just referred to. That act did not add anything to the efficiency of the local custom as a mode of acquiring title. It left that right as it found it  a pure license, revocable before execution. Such acts, bearing the form of legislative licenses, are not uncommon, and their effect has been clearly defined. It has never been thought that the privileges conferred by them were vested rights in the sense of debarring the public from revoking them at pleasure. * * * a legislative permission to appropriate to individual use a part of the jus publicum, does not, per se, deprive the public of a right to resume the privilege granted, unless it appears that it was the intention to vest such privilege irrevocably in the licensee. The wharf act of this state clearly leaves, in this respect, nothing in doubt, for it expressly announces that after the riparian proprietor has, in point of fact, erected his wharf or made any other improvement below the high water line, then, and not till then, the land so appropriated shall become his own. Prior to this event, he has no rights in the water *466 or the land under it, either by the statute or by the local custom, which are not subservient to the legislative will."
And see American Dock and Improvement Co. v. Trustees for Support of Public Schools, 39 N.J. Eq. 409, 413 (Ch. 1885); Bailey v. Driscoll, above, 19 N.J. at page 369; 2 Tiffany, Real Property (3d ed. 1939), § 666, p. 717.
The Attorney General aptly notes that up to the time The United Companies acquired rights under L. 1869, c. 386, and ever since, statutory conveyances and licenses in the form of privileges and authorizations to enter upon the underwater lands of the State for reclamation and improvement purposes have commonly been drawn in language granting a license identical to that of the upland owner under the local common law to acquire title to off-shore lands by reclamation and improvement. The choice of the language used was a considered one; it conformed to the legislative intent to vest a license of a scope and effect recognized at local common law, mainly in special grants to corporations which, according to the prevalent view, were not allowed to fill in or wharf out in the absence of specific legislative authority.
The public policy of New Jersey, as evidenced by a consistent course of legislation on a given subject matter, may be invoked to assist in ascertaining the legislative intent. Conover v. Public Service Ry. Co., 80 N.J.L. 681 (Sup. Ct. 1910). And where words used in a statute have received a judicial construction, the Legislature will be deemed to have used them in a sense that has thus been ascribed to them. Commercial Trust Co. of New Jersey v. Hudson County Board of Taxation, 87 N.J.L. 179, 183 (E. & A. 1914); Lynch v. City of Long Branch, 111 N.J.L. 148, 153 (Sup. Ct. 1933).
The language of L. 1869, c. 386, may readily be construed when compared with the language in similar legislative authorizations. Particularly pertinent in this regard is the Wharf Act of 1851, p. 335. There the Legislature declared that:
*467 "* * * it shall be lawful for the owner of lands situate along or upon tide waters to build docks or wharves upon the shore, in front of his lands, and in any other way to improve the same, and, when so built upon or improved, to appropriate the same to his own exclusive use."
Compare the language of The United Companies Act, L. 1869, c. 386:
"* * * that the said United Companies shall be and they are hereby authorized to reclaim and erect wharves and other improvements in front of any lands now owned by or in trust for them, or either of them, or by any company in which they now hold the controlling interest, adjoining Kill von Kull or any other tide waters of this state; and when so reclaimed and improved to have, hold, possess and enjoy the same as owners thereof; * * *."
The latter language is a paraphrase of that in the Wharf Act. Statutes in pari materia may, of course, be construed together. As we have seen, the Wharf Act has judicially been construed to create a revocable license. The language of the two acts being substantially similar, The United Companies Act must also be interpreted as granting nothing more than a mere license, revocable and terminable and creating no vested property right in the riparian owner in lands fronting his upland.
Absent from chapter 386 of the Laws of 1869 are any express words of grant of an interest in land such as plaintiff claims. None may be implied. The Harsimus Cove Law, L. 1868, c. 248, under which The United Companies obtained fee simple title to valuable off-shore lands in the Hudson River at Jersey City, shows that the Legislature knew how to employ words of grant when it so intended; express, apt and precise language was there used to create a freehold estate. It could hardly have done less had it intended by the 1869 law to grant The United Companies an interest in subaqueous lands in Fisher Cove. The words "grant," "convey," "right and title," "estate"  none is found in the 1869 act. It is not unreasonable to insist that a statutory grant which is intended to convey an estate in public lands be drafted in language designed to show that *468 intention the same as if there were a conveyance between two private parties. Cf. Morris Canal and Banking Co. v. Central Railroad Co., 16 N.J. Eq. 419, 431-433 (Ch. 1863).
A legislative grant is to be construed strictly: most favorably to the sovereign (the public), and most strongly against the grantee. Townsend v. Brown, 24 N.J.L. 80, 87 (Sup. Ct. 1853); Hetfield v. Central R.R. Co., 29 N.J.L. 571, 575 (E. & A. 1862); City of Passaic v. State, 33 N.J. Super. 37, 40 (App. Div. 1954).
We have not the slightest doubt of the legislative intention, as expressed in the body of chapter 386, to grant nothing more than a revocable license. It is of interest, however, to look at the language of the preamble of that act as further evidence of the correctness of our conclusion. (Were there any doubt whatsoever as to the legislative intention, then it would be entirely proper, of course, to look to the preamble in aid of statutory construction. Bass v. Allen Home Improvement Co., 8 N.J. 219, 225 (1951)). One is immediately struck by the mention of the recent Harsimus Cove "grant of lands under water" to The United Companies for $500,000  this refers to L. 1868, c. 248  as contrasted with the language that The United Companies "are desirous of having the right and privilege of erecting and making wharves, piers, and other improvements in front of their lands now owned by or in trust for them, so that they may safely make such improvements as they may find necessary to facilitate their business." (Italics ours.) It is entirely clear that the words "right and privilege" refer to something less than what was created in the 1868 grant. The words are words of license, and they appear again in the enacting clause.
This seems as appropriate a place as any to comment upon another aspect of the preamble. One at once notices the deliberate reference to the $500,000 paid for the Harsimus Cove grant. Contrast the language of the body of the act, which calls for payment to the State Treasurer of $20,000 "in full satisfaction for the right and privilege hereby granted." Chapter 386 involved at least 44 parcels of land *469 (we accept plaintiff's estimate), located along tide-flowed waters around the State and covering many hundreds of acres of subaqueous land. The Fisher Cove parcel itself involved 1,000 feet of waterfront and 73 acres of land. As the trial court remarked, the respective considerations of $500,000 and $20,000 are striking in their disparity. The Legislature could hardly have intended to give plaintiff's predecessor an indefeasible right to acquire a fee simple in so large an area of public lands.
One need not look far to determine why The United Companies sought and obtained the passage of L. 1869, c. 386. In the first place, the Camden and Amboy Railroad and Transportation Company at that time had no express corporate power to reclaim or fill up lands under water. Nor did it enjoy any special legislative license to fill up or reclaim adjoining submerged lands. State v. Brown, 27 N.J.L. 13 (Sup. Ct. 1858), may have been thought to raise some question of its right to reclaim, for there the court, while not passing on the question, expressed doubt whether a corporation, acquiring a right-of-way under its charter (as had Camden and Amboy under the deed from the Folwells), was competent to exercise the privilege of a riparian owner of the fee. Further, L. 1869, c. 383, passed the same day as c. 386, had expressly repealed the Wharf Act of 1851 insofar as it applied to the tidewaters of the Hudson River, New York Bay and Kill von Kull. Chapter 386 conferred upon The United Companies the privilege of reclaiming and erecting wharves and other improvements fronting their lands on these waters. In addition, it granted the same privilege with respect to tidewaters elsewhere throughout the State. Plaintiff itself provides another reason when it notes that The United Companies Act of 1869 "gave the right to reclaim which extended not merely to low water mark, the limit of the common law right, but to the exterior bulkhead lines and lines of solid fill." The United Companies had need of the type of license granted them by chapter 386, and that license was saved from repeal and impairment by the proviso in *470 the third section of chapter 383 which declared that nothing in the act was in any wise to repeal or impair any right to reclaim made directly by legislative act.
In insisting that its predecessor obtained a vested right to secure a fee simple upon reclamation of the submerged lands in Fisher Cove, plaintiff ignores the fact that the State, during its entire history, had never provided for alienating its title except upon the exercise of the tacit authority to reclaim tolerated under the local common law, the authority expressed in the Wharf Act or that given by legislative license; or by grant of the fee by special legislation, or by conveyance of the fee or a leasehold interest with an option to take the fee, as provided by the General Riparian Act of 1869, c. 383. In short, there was no precedent prior to 1869, or since, from which one might conclude that the Legislature intended by the language it used in L. 1869, c. 386, to create the type of estate for which plaintiff contends, previously and since unknown, in dealing with subaqueous lands.
A number of minor points require passing attention in connection with the discussion just concluded.
Plaintiff relies here, as it did below, on City of Hoboken v. Pennsylvania R.R. Co., 124 U.S. 656, 8 S.Ct. 643, 31 L.Ed. 543 (1888), as authority for the proposition that The United Companies Act of 1869 created a grant rather than revocable license. The trial court fully disposed of that case in its opinion, 45 N.J. Super., at page 465 et seq., and there is little that we can add to its discussion. The United States Supreme Court was dealing with a situation in which the right to reclaim and improve had, in fact, already been exercised, thereby vesting title to the subject premises in Hoboken, New Jersey, in The United Companies in fee. The lands in this case have not been reclaimed or improved. The issue here is completely dissimilar and, of course, different parties are involved. The court in the Hoboken case did not predicate its conclusion upon the authority of a prior construction of the 1869 act by the New Jersey courts  indeed, could not, because there *471 had been no such construction  but treated the question as res nova. We are not bound by its decision in determining the construction of our statute.
Plaintiff and the Pennsylvania Railroad Company, amicus curiae, also seek comfort in two opinions rendered by the Attorney General's office dealing with the 1869 act. The first is a letter memorandum by the deputy attorney-general assigned as special counsel to the Board of Commerce and Navigation, dated March 23, 1927, dealing with an application of the City of New Brunswick for bulkheading certain lands along the Raritan River. He advised the Board that, in his opinion, The United Companies became vested with the State's title to lands under water in front of their uplands by virtue of the act of 1869, that act being in fact a legislative grant by the State to The United Companies. The second is a letter memorandum from another deputy attorney general to the Commissioner of the Department of Conservation and Economic Development, dated July 13, 1955, holding that the act of 1869 was a grant of an estate in land, not subject to statutory limitation, and that there was no power in the State or in the Department of Conservation of Economic Development to recapture and reconvey the land, quoting in support the United States Supreme Court's opinion in City of Hoboken v. Pennsylvania R.R. Co., above. This letter opinion was given in connection with an application that had been made by plaintiff to secure a confirmatory deed from the State for the subaqueous land here in question and, conjointly therewith, riparian deeds for underwater tracts on either side of those lands as a non-riparian owner under R.S. 12:3-2. We are not bound by such letter opinions handed down in the executive branch of the government. The construction of the 1869 act is for the courts, and we now deal with that problem for the first time.
Finally, the Pennsylvania Railroad as amicus curiae seeks to support the argument that the 1869 act created an indefeasible title beyond the power of the State to recapture and reconvey, by referring to certain reports of the formerly *472 constituted riparian commissioners. The commissioners were appointed under the General Riparian Act of 1869, c. 383. Beginning in January 1870 they regularly rendered an annual report to the Governor and, by way of appendix, scheduled grants or leases made by them during the one-year period covered by the report. Beginning with the report for 1877, the commissioners undertook to make their appended schedule a cumulative one from April 11, 1864 (the date of approval of the Riparian Act of 1864, c. 391, under which the original riparian commissioners were appointed), and they would abstract not only the grants and leases they had made, but also those made by the Legislature. In the annual report of the riparian commissioners for 1877 the appendix lists, under grants in fee made by the Legislature, the grant to the New Jersey Railroad and Transportation Co. under date of March 31, 1869, for lands in the "Hudson & Delaware rivers, &c.," located in Hudson, Union, Camden, Middlesex, Mercer and Burlington Counties, for $20,000. The same notation appears in the reports for the years 1878 through 1893. Amicus curiae argues that this represents a contemporaneous and continuing administrative construction of The United Companies Act, and therefore is entitled to great weight in construing the act. The answer to this must be the same as given in the case of the two letters just discussed: the construction of the act is a judicial responsibility. The Attorney General has in this case cogently and persuasively argued that the 1869 act did not in fact grant an indefeasible right in the lands under Fisher Cove, and we agree.
We conclude that The United Companies acquired nothing more than a revocable license to reclaim and improve, and thus secure the fee in, submerged land abutting the Fisher Cove uplands.

VI.
Plaintiff next argues that if chapter 386 of the Laws of 1869 gave a license, rather than an estate in land, the license is irrevocable because $20,000 was paid therefor. Such consideration, *473 it contends, operated to convert a simple license into an executed license, which admits of no right of revocation.
We are not dealing here with a license coupled with an interest, or with a situation where monies were expended in reliance upon the license. The fact that consideration is paid for a license does not make it irrevocable. Cf. East Jersey Iron Co. v. Wright, 32 N.J. Eq. 248, 253 (Ch. 1880); Lang v. Dupuis, 382 Ill. 101, 46 N.E.2d 21 (Sup. Ct. 1943); Tucker v. Carter Oil Co., 315 Ill. App. 264, 43 N.E.2d 99 (App. Ct. 1942); Sweeney v. Bird, 293 Mich. 624, 292 N.W. 506 (Sup. Ct. 1940), Minnesota Valley Gun Club v. Northline Corp., 207 Minn. 126, 290 N.W. 222 (Sup. Ct. 1940); 37 C.J., Licenses, 296 (1925); 53 C.J.S., Licenses, § 92, p. 819 (1948). One may bargain and pay consideration for a revocable license as well as an irrevocable license. Plaintiff claims that if the license in question is revocable, the State could accept the licensee's money and in the next instance deprive it of its grant. This does not follow; where monies are paid for a revocable license, the licensee, on clearly equitable grounds, has a reasonable time to exercise it and will, if need be, be protected in the courts.

VII.
The trial court found that the license had been revoked by L. 1891, c. 124, and found further support "for the establishment of a public policy to revoke all such licenses theretofore given" in L. 1894, c. 71, and L. 1903 (2d spec. sess.), c. 1 (R.S. 18:10-5). Defendant relies essentially on the 1891 act in support of its claim that The United Companies' license was revoked; the Attorney General supports the trial court's determination by reference to the 1894 and 1903 acts. We conclude that neither statute revoked the license granted by L. 1869, c. 386.
Although L. 1891, c. 124, repealed the Wharf Act of 1851 as to all lands in New Jersey under tidewater, it contained a proviso excepting from the force of the act "any grant of *474 land under water, or right to reclaim made directly by legislative act, or grant or license, power or authority, so made or given, to purchase, fill up, occupy, possess and enjoy lands covered with water fronting and adjoining lands owned or authorized to be owned by the corporation, or grantee or licensee in the legislative act mentioned [the Wharf Act], * * *." There was similar language as to grants or licenses to build docks, wharves and piers, opposite and adjoining the uplands, and the exception also excluded the revocability of licenses that might have been given by freeholder boards under the Wharf Act to build docks, wharves or piers. It is clear from this proviso that the 1891 act did not revoke the license given The United Companies in 1869. Katzenbach v. Armstrong Cork Co., 99 N.J. Eq. 32 (Ch. 1926), affirmed 102 N.J. Eq. 333 (E. & A. 1928), cited by the trial court and by defendant in support of the argument of revocation, seems clearly to have been in error in ignoring the proviso in the 1891 statute. The vice chancellor did not mention it. Katzenbach has not been cited by any court since.
The contention that the Public School Fund Act of 1894, c. 71, operated to revoke the license is equally untenable. Some reference to the origins of this legislation is relevant. Art. IV, Sec. VII, par. 6 of the 1844 State Constitution provided generally that the fund for the support of free schools, and all money, stock and other property which might thereafter be appropriated for that purpose, should be securely invested and remain a perpetual fund, the income therefrom to go exclusively for the support of free public schools and be immune from application to any other purpose. (The same provision is found in the 1947 Constitution, Art. VIII, Sec. IV, par. 2.) By an act of 1871, c. 530, p. 98, the Legislature provided that "all monies hereafter received from the sales and rentals of the land under water, belonging to the state, shall be paid over to the trustees of the school fund, and appropriated for the support of free public schools, and shall be held by them in trust for that purpose." L. 1894, c. 71 provided:
*475 "That all the lands under water belonging to this state be and the same hereby are irrevocably appropriated for the support of free schools in this state, and that all monies hereafter received from the sales and rentals of such lands under water belonging to this state, shall be paid over to the trustees of the school fund, and appropriated for the support of free public schools, and shall be held by them in trust for that purpose, * * *."
The School Act of 1903, L. 1903 (2d spec. sess.), c. 1, § 168 (R.S. 18:10-5) carried this provision forward.
We do not agree that the 1894 and 1903 acts revoked the license given to The United Companies. What the Legislature intended by these laws was that all monies received from the sale or lease of the State's underwater lands would go into the permanent School Fund for the exclusive benefit of our public schools. This absolute dedication did not and could not reach the license in question. Revocation of a license may not be accomplished sub silentio, but must be evidenced in some positive manner. There is nothing in the language of the 1894 and 1903 acts indicating that licenses given by the Legislature and outstanding were to be revoked. It may also be observed that the School Fund, both before and after 1894, consisted of money and securities. Lands of the State under tidewater were not the fund, but the source of the fund.

VIII.
We next consider the question of whether the rights acquired by The United Companies under L. 1869, c. 386, were abandoned. Plaintiff insists that they were not, and argues that defendant must first show an intention on the part of The United Companies to abandon or relinquish their right, and an external act or an omission to act by which such intention is carried into effect, citing Freedman v. Lieberman, 2 N.J. Super. 537 (Ch. Div. 1949); Nuzzi v. Corcione, 139 N.J. Eq. 339 (Ch. 1947) (both easement cases), and 1 C.J.S., Abandonment, § 3, p. 8 (1936).
The rights of The United Companies in Fisher Cove, granted by the 1869 act, had not been exercised for over 86 years when, in 1955, it was sought to convey those rights *476 to plaintiff. Plaintiff argues that the statutory grant was unlimited in time. It refers to the early railroad history and activity in this State and asserts that it was not unnatural for the Legislature to invest The United Companies "with an unrestricted right to improve and take title to tide-flowed lands bordering their upland at such time in the future as they chose to exercise the rights given." Pointing to the language of the preamble in the 1869 act, where the purpose of the legislation was expressed as being to enable The United Companies to "safely make such improvements as they may find necessary to facilitate their business," plaintiff argues that improvements of the character contemplated depended upon the imponderables of population growth, industrial development and the general economy, so that the passage of fourscore years or more is not to be held against it.
This was not the sort of stimulation of activity which the riparian commissioners and the Legislature of the day contemplated. In their report of February 1, 1865, the commissioners noted that "the greatest benefit which the State is to derive from such improvements as alone should be tolerated on any terms, is to arise from the commercial navigation and its incidents, which such improvements will surely stimulate on our shores. Compared with these results, any mere pecuniary compensation upon the sale of these lands would be insignificant. Still when private emolument is to be made from the acquisition of these lands and the advantages and privileges connected with them, it is not amiss that the State should receive a share of the benefit for the use of all her citizens."
We are of the opinion that abandonment has been established. The United Companies never took a single step toward filling in or improving the lands under water in front of their Fisher Cove property. Recent photographs show a shore fallen into decay and waste. It has been said that the right to the enjoyment of a license may be lost by abandonment and non-user, as by the neglect of the licensee to avail himself of the license under such circumstances *477 as evidence an intention to abandon. 53 C.J.S., Licenses, § 87, p. 814 (1948); Tatum v. City of St. Louis, 125 Mo. 647, 28 S.W. 1002 (Sup. Ct. 1894). As was said in another context, East Jersey Iron Co. v. Wright, above, 32 N.J. Eq. at pages 256-257 (Ch. 1880), and paraphrasing the language of that case, if we consider the general design of chapter 386 of the Laws of 1869, the nature of the property which was the subject matter of the arrangement, the situation and relation of the State and The United Companies, and the character of the privilege granted, it is impossible to believe that the Legislature intended to give The United Companies an exclusive and irrevocable privilege to reclaim the lands, which the Companies might exercise or not, just as they pleased; and if they chose not to exercise it, that their arbitrary choice in the matter should have the effect of preventing the State from permitting one of its natural resources from being developed. The object of the Legislature was undoubtedly just the reverse of this; its purpose was to have its resources developed, and not to grant a privilege which could be used to clog their development. A failure to reclaim for more than 86 years was abandonment, unmistakable and absolute. Cf. Leasehold Estates, Inc., v. Fulbro Holding Co., 47 N.J. Super. 534, 563 (App. Div. 1957).
In this connection, plaintiff places considerable reliance upon the provisions of L. 1934, c. 33, entitled "An Act for the cancellation of the State's riparian grant to Joseph Cramer, Incorporated, and the return of the monies paid to the State therefor." In 1926 Joseph Cramer, Inc., had secured a riparian grant from the Board of Commerce and Navigation to approximately 140 acres of land under the water of Fisher Cove, including the lands (73 acres) claimed in this action by plaintiff, the 140 acres comprising what is known as Parcels "A," "B" and "C." Plaintiff claims Parcel C. This grant was made on the basis of the grantee's claim that it was a riparian owner of lands abutting Fisher Cove, including, albeit erroneously, all the 1,000 feet of shoreline here in question. By L. 1934, c. 33, the Legislature *478 authorized the refund to Joseph Cramer, Inc., of the $25,502.85 paid the State as consideration for its submerged lands. And see L. 1934, c. 154, amending c. 33.
Plaintiff takes the position that the 1934 law constituted, in effect, a confirmation by the Legislature of the license given by the 1869 act. It states that when the existence of the 1869 grant was discovered "the Board of Commerce and Navigation demanded and received a reconveyance from Joseph Cramer, Inc." There is no evidence whatsoever of such a demand. Plaintiff also alleges that "the Legislature took pains to investigate the Railroad's compliance with these conditions [in the 1869 act], including its ownership of the upland * * *. Thus in the most solemn form imaginable the State confirmed the validity of its 1869 grant to Camden and Amboy * * *, including the proof of its riparian ownership." At another place in its brief, plaintiff asserts that "the Legislature of 1934 understood that there had been no such claimed revocation," and that "in declaring the riparian grant to Cramer void * * * it explicitly recognized the survival of those rights" granted by L. 1869, c. 386.
There is no testimony, nor may any inference be drawn from the language of the preamble of L. 1934, c. 33, that the Legislature investigated The United Companies upland title, or that it confirmed the validity of its 1869 grant; nor is there any evidence that the Legislature believed that there had not been a revocation and that the rights obtained in 1869 survived. There is nothing in the statute declaring the grant to the Cramer company in 1926 void in view of L. 1869, c. 386, or otherwise. What the preamble does say is that Cramer did not own all of the upland; that The United Companies owned 1,000 feet of it; that chapter 386 was still on the statute books, and that by reason of these factors, "the value of said grant of lands considered as a whole had been destroyed and rendered useless to said Joseph Cramer, Incorporated."
The simple fact is that if Cramer did not own all of the upland, as he had certified when he obtained his riparian *479 grant, his grant would have been void according to the terms of his deed, and according to law. As the State points out in its brief, it was not necessary to allude to L. 1869, c. 386, to prove the point, but reference was made to that act for a different reason, namely, that the 1869 act clouded Cramer's title so as to make it without value and useless. It is a reasonable assumption that the Cramer company, discovering the true situation, sought the legislation to obtain the return of the consideration paid for the riparian grant, and probably caused to be drawn the bill which was passed.
The 1934 act refunding Cramer its money neither confirmed nor purported to confirm the license or privilege given The United Companies under the 1869 act. The act, both in its title and in its enacting clauses, clearly dealt only with the return of the monies previously paid the State by Cramer. Nor did the 1934 act constitute a legislative construction of, or purport to construe, the 1869 act. Whether the license or privilege granted in 1869 was still in effect in 1934 is a question now raised for the first time in this court.
We observe, incidentally, that any contention that the 1934 act be construed as constituting a confirmation or renewal of the 1869 license would immediately raise a question as to its constitutionality. Its title is clearly insufficient as the title of an act which would purport to confirm, construe or renew a grant made to corporations other than Joseph Cramer, Inc., by the 1869 act. Art. IV, Sec. VII, par. 4 of the State Constitution requires that "every law shall embrace but one object, and that shall be expressed in the title."

IX.
There is an additional reason why plaintiff may not prevail in this action, and that is that the license or privilege granted by the 1869 act could not be conveyed to plaintiff separate from the upland. It will be recalled that plaintiff does not claim ownership of any of the upland along Fisher Cove.
*480 The right granted The United Companies under L. 1869, c. 386, was a right appurtenant to the upland, as distinguished from a right in gross in the lands under water. We have already adverted to the strong similarity between the license given by chapter 386 and the language of the Wharf Act of 1851. The nature of the right conferred by the Wharf Act, confirming a right which existed in the local common law, was defined in New Jersey Zinc and Iron Co. v. Morris Canal and Banking Co., 44 N.J. Eq. 398, 401 (Ch. 1888), affirmed 47 N.J. Eq. 598 (E. & A. 1890), where it was said:
"A grantee of lands abutting on a navigable stream, acquires no peculiar rights, as incidents of his estate, in the land beyond the high-water line lying in front of his land, but in virtue of a local custom, long prevalent in this State, and now having the force of established law, the adjacency of his land to the stream invests him with a license to fill in and wharf out, on the public domain, to such an extent as does not interfere with the public rights of fishing and navigation, and this license, when executed, becomes irrevocable, and confers on the riparian owner a good and indefeasible title to the land thus reclaimed. Gough v. Bell, 2 Zab. 441 [22 N.J.L. 441]; Stevens v. Paterson and Newark R.R. Co., 5 Vr. 532 [34 N.J.L. 532]. No such license exists, however, in favor of any person, except a riparian owner. It is a right growing out of the adjacency of his land to navigable water, and is incident to the ownership of land abutting on a navigable stream." (Italics supplied.)
The general privilege thus granted by section 1 of the Wharf Act of 1851 created merely rights or privileges appurtenant to the upland, which could not be assigned or otherwise separated from the ownership of the upland.
L. 1869, c. 386, clearly expresses an intention that the right or privilege granted is appurtenant to the upland. The authorization given to The United Companies is "to reclaim and erect wharves and other improvements in front of any lands now owned by or in trust for them, or either of them." (Italics ours.) The act closes with the direction that The United Companies file with the Secretary of State a map and description of the lands under water "in front of the upland." Incidentally, the preamble also mentions the right and privilege of erecting and making wharves, *481 piers and other improvements "in front of other lands" owned by the Companies.
We have already referred to the language of the Harsimus Cove Act, L. 1868, c. 248, and compared it with the language of the 1869 act under which plaintiff claims. Comparison demonstrates the difference between an outright grant of title which normally can be separated from the upland, and the grant of a right or privilege appurtenant to the upland which cannot. Had the right to reclaim, granted under the 1868 act, been exercised, the right of title then possessed by the owner would have become a right or title in gross, and this by the very language of the act. However, there has been no reclaiming, no improvement. Until the right to reclaim was exercised, it could not be separated from ownership of the upland nor could it be conveyed out. Cf. Morris Canal and Banking Co. v. Central Railroad Co., above, 16 N.J. Eq. at page 430 et seq.

X.
As stated in Board of National Missions of Presbyterian Church in United States v. Neeld, 9 N.J. 349, 357 (1952), a preamble is "part and parcel of the bill itself, always remains a preface to it and becomes part of the legislative enactment." We once more look to the preamble to L. 1869, c. 386, not to limit the grant of a license so clearly made in the body of the act but, again, merely to examine into the purpose of the law.
The preamble states that The United Companies are desirous of the right to reclaim "so that they may safely make such improvements as they may find necessary to facilitate their business * * *." The last four words, "to facilitate their business," must be understood to represent the meaning they had in 1869. The business of railroads in that period was to transport passengers and freight, and to that end build railroad lines, terminals, wharves, and such other facilities as were useful and necessary to railroading. It cannot be said that railroads were in the business of developing *482 land for industrial plants, even though it might enhance their freight business.
There is another observation to be made, and that is the use of the personal pronoun "they" in the 1869 act. "They" can refer to no one other than The United Companies, thus limiting the making of improvements to those companies or possibly their railroad successors. In the light of these considerations, the right to reclaim the underwater lands in Fisher Cove was not only tied up with the ownership of the right of the uplands, but more so with the particular business of The United Companies. The Legislature cannot be said to have intended that the right to reclaim could be severed from the use of the railroad property, and granted to a private corporation for uses other than the transportation functions of the statutory licensee.

XI.
Our determination makes unnecessary consideration of the remaining points raised in the several briefs. The judgment of the Chancery Division is affirmed.