76 N.J. Super. 90 (1962)
183 A.2d 788
SAFEWAY TRAILS, INC., A CORPORATION OF THE STATE OF MARYLAND, PLAINTIFF,
v.
DAVID D. FURMAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY AND HEAD OF THE DEPARTMENT OF LAW AND PUBLIC SAFETY; NED J. PARSEKIAN, ACTING DIRECTOR, DIVISION OF MOTOR VEHICLES AND JOHN A. KERVICK, STATE TREASURER OF NEW JERSEY, DEFENDANTS. THE GREYHOUND CORPORATION, A CORPORATION OF THE STATE OF DELAWARE, PLAINTIFF,
v.
JOHN A. KERVICK, TREASURER OF THE STATE OF NEW JERSEY, AND NED J. PARSEKIAN, ACTING DIRECTOR, DIVISION OF MOTOR VEHICLES, DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY, DEFENDANTS. LINCOLN TRANSIT CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY, HILL BUS CO., A CORPORATION OF NEW JERSEY, ROCKLAND COACHES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, HUDSON BUS TRANSPORTATION CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY, SOMERSET BUS CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY, DECAMP BUS LINES, A CORPORATION OF THE STATE OF NEW JERSEY, MANHATTAN TRANSIT COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, AND WESTWOOD TRANSPORTATION LINES INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS,
v.
NED J. PARSEKIAN, ACTING DIRECTOR, DIVISION OF MOTOR VEHICLES, DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided July 31, 1962.
*92 Mr. Joseph Harrison (Messrs. Harrison & Jacobs, attorneys), and Mr. William A. Roberts of the Washington, D.C. Bar pro hac vice (Messrs. Roberts & McInnis, attorneys), argued the cause for the plaintiff, Safeway Trails, Inc.
Mr. Merritt Lane, Jr. (Messrs. McCarter & English) argued the cause for the plaintiff, The Greyhound Corporation.
*93 Mr. George M. Eichler argued the cause for the plaintiff, Lincoln Transit Co., Inc. and the seven other plaintiffs joined therewith.
Mr. Alan B. Handler, Deputy Attorney General of the State of New Jersey, argued the cause for all defendants (Mr. Arthur J. Sills, Attorney General of the State of New Jersey, attorney).
GIULIANO, J.S.C.
This is a suit for a declaratory judgment with respect to the proper application of the Interstate Busses Excise Tax, R.S. 48:4-20, and for a judgment with respect to the constitutionality of that statute insofar as it may be held to apply to miles traversed by interstate busses over the New Jersey Turnpike and the Garden State Parkway. Plaintiffs seek an injunction restraining the defendants from enforcing R.S. 48:4-20 with respect to interstate mileage traveled by plaintiffs' busses on the New Jersey Turnpike and the Garden State Parkway. Plaintiffs also seek a mandatory injunction requiring the defendants to refund all sums paid by the plaintiffs under R.S. 48:4-20 on account of interstate mileage traversed on the New Jersey Turnpike and Garden State Parkway since June 1, 1960.
Plaintiffs Lincoln Transit Co., Inc., Hill Bus Co., Rockland Coaches, Inc., Hudson Bus Transportation Co., Inc., Somerset Bus Co., Inc., DeCamp Bus Lines, Manhattan Transit Company and Westwood Transportation Lines, Inc., all corporations of the State of New Jersey, instituted an action in the Superior Court of New Jersey, Appellate Division (Docket A-30-60), naming as defendant Ned J. Parsekian, Acting Director, Division of Motor Vehicles, Department of Law and Public Safety of New Jersey. Safeway Trails, Inc., a corporation of the State of Maryland, started suit in the Superior Court of New Jersey, Law Division, Essex County (Docket L-12425-60 P.W.) against David D. Furman, Attorney General of the State *94 of New Jersey and head of the Department of Law and Public Safety, Ned J. Parsekian, Acting Director, Division of Motor Vehicles, and John A. Kervick, State Treasurer of New Jersey. The Greyhound Corporation, a corporation of the State of Delaware, instituted an action in the Superior Court of New Jersey, Chancery Division, Mercer County (Docket C-1843-60) against John A. Kervick, Treasurer of the State of New Jersey and Ned J. Parsekian, Acting Director, Division of Motor Vehicles, Department of Law and Public Safety of the State of New Jersey. These actions, in which basically the same relief was being sought, were consolidated by order of the Superior Court, Appellate Division, entered July 10, 1961 and transferred to the Superior Court, Law Division, Essex County, for trial.
All of the plaintiffs are common carriers of passengers by motor bus owning and operating autobusses which traverse the highways of this State for the purpose of carrying both interstate and intrastate passengers. By reason of their interstate operations plaintiffs are subject to and required to comply with the provisions of R.S. 48:4-18 et seq. Pursuant to R.S. 48:4-20, plaintiffs are obliged to pay the sum of one-half cent for each mile traveled by their busses over the highways of this State as part of an interstate journey. This sum is exacted as an excise for the use of the highways of this State. No excise is payable, however, for miles traveled in municipalities to which monthly franchise taxes have been paid under the provisions of N.J.S.A. 48:4-14 et seq. By virtue of the provisions of R.S. 48:4-30 and R.S. 48:4-32, refusal by plaintiffs to pay the excise will expose them to the probable revocation of their motor vehicle registrations and a penalty of five dollars for each day the tax remains unpaid after it is due.
R.S. 48:4-20 has been in effect since May 7, 1934. Its source is L. 1934, c. 68. The New Jersey Turnpike was made available to the public in November 1951. Shortly thereafter plaintiffs inaugurated scheduled or charter service *95 via the New Jersey Turnpike. The Garden State Parkway was made available to the public in August 1954. Several of the plaintiffs have taken advantage of the facilities of the Parkway since that date. All of the plaintiffs have continuously engaged in the said services via the Turnpike and Parkway, as the case may be, since these facilities were made available to them.
On November 14, 1950, by Formal Opinion Number 78, the Attorney General of New Jersey advised the Deputy Director of the New Jersey Division of Taxation, that interstate carriers of persons using the New Jersey Turnpike would not be subject to the tax imposed by R.S. 48:4-20. It was the Attorney General's opinion that the New Jersey Turnpike was not a highway within the meaning of the taxing statute.
On April 18, 1960 the then Attorney General of New Jersey, by Formal Opinion Number 11, advised the Acting Director of the New Jersey Division of Motor Vehicles that R.S. 48:4-20 does apply to interstate busses using the New Jersey Turnpike. This opinion, which reversed Formal Opinion Number 78 (1950), not only dealt with the question of whether or not the New Jersey Turnpike is a highway within the meaning of R.S. 48:4-20, but also with the constitutional questions which would arise out of this application of the excise tax.
Prior to July 25, 1960 the Acting Director of the Division of Motor Vehicles promulgated an order or regulation that the excise tax imposed by R.S. 48:4-20 is applicable to interstate mileage traversed over the New Jersey Turnpike. The plaintiffs were required to pay and have paid under protest since July 25, 1960, excise for the interstate miles traveled by their busses over the New Jersey Turnpike and the Garden State Parkway.
The question of whether or not the Garden State Parkway and the New Jersey Turnpike are "highways" within the meaning and for the purpose subserved by R.S. 48:4-20 must of necessity be answered first. This is due to the *96 fact that if this court answers the above question in the negative there would be no occasion to examine the constitutional issues which arise out of the present application of the excise tax.
R.S. 48:4-20 reads as follows:
Every person owning or operating an autobus which is operated over any highway in this state for the purpose of carrying passengers from a point outside the state to another point outside the state, or from a point outside the state to a point within the state, or from a point within the state to a point outside the state shall pay to the commissioner of motor vehicles, as an excise for the use of such highway, one-half cent for each mile or fraction thereof such autobus shall have been operated over the highways of this state, except that no excise shall be payable for the mileage traversed in any municipality to which such owner or operator has paid a monthly franchise tax for the use of its streets under the provisions of section 48:4-14 of this title.
The cardinal guide in the interpretation of a statute is the intention of the Legislature, and that intent so far as possible is to be derived from the language of the statute. Harvey v. Board of Chosen Freeholders of Essex County, 51 N.J. Super. 363 (Law Div. 1958), affirmed 30 N.J. 381 (1959). The defendants argue that the language of R.S. 48:4-20 is clear and unambiguous and that in such a case there is no room for judicial construction. Cf. Bass v. Allen Home Imp. Co., 8 N.J. 219 (1951); Rosenthal v. State Employees', etc., System of N.J., 30 N.J. Super. 136 (App. Div. 1954); Sutherland, Statutory Construction (3d ed. 1943), § 45021.
While defendants' premise is true in the ideal situation, it cannot be said to be all-inclusive. The following language taken from the late Chief Justice Vanderbilt's opinion in Watt v. Mayor, etc. of Franklin, 21 N.J. 274, 277, 278 (1956), is instructive:
"In every case involving the application of a statute, it is the function of the court to ascertain the intention of the Legislature from the plain meaning of the statute and to apply it to the facts as it finds them, Carley v. Liberty Hat Mfg. Co., 81 N.J.L. 502, *97 507 (E. & A. 1910). A clear and unambiguous statute is not open to construction or interpretation, and to do so in a case where not required is to do violence to the doctrine of the separation of powers. Such a statute is clear in its meaning and no one need look beyond the literal dictates of the words and phrases used for the true intent and purpose in its creation. But few statutes can boast of such clarity or stand that test through every inquiry, and the court must take the responsibility of determining in each case presented whether the particular statute, in its application to it, is clear and unambiguous.
The need for construction arises in two instances. As we move away from the ideal of a clear and unambiguous statute we find statutes that on their face are clear and unequivocal but in light of related legislation and of the surrounding facts and circumstances of the case in which it is applicable, the true meaning becomes indefinite or obscure. In these instances it may be the plain meaning of the words themselves that casts doubt as to the true intention of the Legislature, or often it is the absurdity of the result flowing from a literal application of that plain meaning that causes wonder as to the true purpose of the enactment. Then, too, there are those less difficult instances in which the meaning of a statute is obviously obscure or doubtful, where the language used is per se capable of dual interpretation. When these circumstances appear the court is not only at liberty to interpret the statute but it is its solemn duty to seek out and give effect to the legislative intent evident from the aids available to it." (Citations omitted)
The learned Chief Justice went on to ask (at p. 278):
"When from the plain meaning of the words used in a statute reasonable men are led to question whether the Legislature intended a particular result, can it be said that their enactment is clear and unambiguous?"
In the instant case the facts show that in 1960 the then Attorney General of New Jersey reviewed the statute here being considered and placed an entirely different construction on the language contained therein than that of his learned predecessor. In the ten-year period between the Formal Opinions rendered by these learned Attorneys General not one word of R.S. 48:4-20 had been altered. The fact that completely opposite conclusions with respect to the application of the same statute were reached by two Attorneys General of this State might be enough to justify this Court's exercise of its interpretative function. *98 There are, however, other factors, such as related statutes and the circumstances which existed at the time R.S. 48:4-20 was enacted which, when taken together, show the need for interpretation.
Applying the principles set forth in Watt v. Mayor of Franklin, supra, to the statute under review, this court feels justified in exercising its interpretative function with reference to whether the Legislature intended the word "highway" in R.S. 48:4-20 to be applied in its broad generic sense or in such a manner as to exclude toll roads from its purview.
The word "highway" is of Saxon derivation, meaning a right of use for passengers whether private or public. It is a generic name for all kinds of ways which are common to all people having occasion to pass over them. Township of Parsippany-Troy Hills v. Bowman, 3 N.J. 97 (1949); Wild v. Deig, 43 Ind. 455, 13 Am. Rep. 399 (Sup. Ct. 1873); Koutsky v. Grabowski, 150 Neb. 508, 34 N.W.2d 893 (Sup. Ct. 1948); Skinner v. Town of Weathersfield, 78 Vt. 410, 63 A. 142 (Sup. Ct. 1906).
There can be no doubt that both the Garden State Parkway and the New Jersey Turnpike are "highways" within the meaning of the word as it is generally used. The statutes under which both projects came into being classify them as such. As to the Garden State Parkway, N.J.S.A. 27:12B-2 provides that:
"In order to facilitate vehicular traffic and remove the present handicaps and hazards on the congested highways in the State * * *, the New Jersey Highway Authority (hereinafter created) is hereby authorized and empowered to acquire, construct, maintain, improve, repair and operate highway projects (as hereinafter defined) * * *."
The definition of a "highway project" is found in N.J.S.A. 27:12B-3(d) to be "any express highway, superhighway or motorway." To the same effect are N.J.S.A. 27:23-1 and N.J.S.A. 27:23-4(b) with regard to the New Jersey Turnpike.
*99 The word "highway," however, is not always afforded a broad, all-inclusive construction. Cf. Arkansas State Highway Commission v. Southwestern Bell Telephone Co., 206 Ark. 1099, 178 S.W.2d 1002 (Sup. Ct. 1944), wherein turnpikes were said to be "public highways" but not "highways of the state" within the meaning of an act authorizing the construction of telephone lines along and over the public highways of the state without requiring payment as compensation for exercising that right.
Various reasons are set forth in support of the position that the Legislature could not have intended to include Turnpike and Parkway mileage for the purpose of measuring the excise tax imposed by R.S. 48:4-20. The argument is made that at the time R.S. 48:4-20 was enacted the Turnpike and Parkway were not yet in existence and that therefore the Legislature could not have intended them to be included within the ambit of the tax imposed. It is further asserted that at the time R.S. 48:4-20 was enacted (L. 1934, c. 68) there were no toll roads in existence in the State of New Jersey, the last of the toll roads having been purchased by the State in or about the year 1921. In 1931 the Legislature repealed all prior statutes authorizing toll roads or plank roads (L. 1931, c. 381).
It is most strongly urged by the plaintiffs that because the responsibility of the State Highway Department is limited solely to free public highways, the excise tax cannot have been intended to apply to mileage traveled over toll roads. R.S. 48:4-23 provides that:
"All moneys derived from the excise hereby imposed shall be paid over monthly by the commissioner of motor vehicles to the state treasurer and such revenues are hereby appropriated to the state highway commission for use by it for the construction and maintenance of highways." (Emphasis added.)
Plaintiffs contend that since the term "highways," as used in R.S. 48:4-23, can only relate to free public highways as opposed to toll roads, it would be unreasonable to place *100 a broader construction on the term "highways" as used in R.S. 48:4-20 in order to justify the inclusion of toll roads some 26 years later. Plaintiffs stress the fact that both of the above sections were enacted at the same time and relate to each other.
An argument which is closely related to the above is that since the Turnpike Authority and the Highway Authority are "independent," "autonomous" bodies which cannot benefit from revenues received by the State, the roads which are operated and maintained by these bodies should not be considered as "highways of the state" within the meaning of the taxing statute.
The defendants, on the other hand, insist that the term "highway" should be understood and applied as it is commonly used, i.e., broad enough to include toll roads. They argue that this was the construction accorded to the term by our courts at a time prior to the repeal of toll roads in this State and that it must be presumed that the Legislature was cognizant of that construction when R.S. 48:4-20 was enacted, and intended to use it in the same sense. Cf. River Development Corp. v. Liberty Corp., 51 N.J. Super. 447 (App. Div. 1958), affirmed 29 N.J. 239 (1959).
The defendants point to the early case of State, Parker, v. City of New Brunswick, 32 N.J.L. 548, 550, 551 (E. & A. 1867) wherein the court said:
"Such roads [turnpikes] are public highways. They are established by the sovereign authority of the state for the common benefit, and although the road-bed and the franchise to take tolls are private property, the easement itself is altogether of a public character. * * * The decision of Wright v. Carter, 3 Dutcher 76, in the Supreme Court of this state, is also founded on the doctrine that the right of the public in a turnpike subject to the payment of tolls, is identical with the right of the public in a common highway."
In Miller v. Penna-Reading Seashore Lines Inc., 117 N.J.L. 152, 154 (E. & A. 1936) it was said that "It is well settled that turnpikes constitute public highways." *101 Defendants also rely on Atlantic & Sub. Ry. Co. v. State Board of Assessors, 80 N.J.L. 83, 86 (Sup. Ct. 1910), where the court said:
"For most purposes a turnpike is regarded as a highway: and it may be said to be generally so regarded when the term highway is used in a statute, unless the words and purposes of the act display a different legislative intent."
While it is true that words which have received judicial construction will generally be deemed to have been used by the Legislature in the sense thus ascribed to them, River Development Corp. v. Liberty Corp., supra, this rule may be inapplicable where the statutes are not in pari materia, or where it is apparent that special reasons exist for treating the words in another fashion.
The cases relied on by the defendants to show the prior judicial construction given to the word "highway" did not involve issues similar to the case at bar. Further, the legislation involved in two of the cases cited is not in pari materia with R.S. 48:4-20. State, Parker, v. City of New Brunswick, supra, involved the question of whether or not a provision in a municipal charter gave local authorities the right to grade and pave a turnpike road lying within the city limits. The court held that the turnpike was a public street and as such was subject to city legislation.
In Atlantic & Sub. Ry. Co. v. State Board Assessors, supra, it was held that within the meaning of the act of 1906 (L. 1906, c. 290) providing for the taxation of the franchises of street railway corporations occupying public streets, highways, roads, lanes and other public places, a turnpike is a public place.
The third case, Miller v. Penna.-Reading Seashore Lines, Inc., supra, was a negligence action wherein a small boy fell against an electrified third rail while crossing the tracks of the defendant company at a turnpike crossing. The Court of Errors and Appeals had before it only the question of the propriety of the trial judge's directed verdict in favor *102 of the defendant. It held that a directed verdict based on the fact that the railroad was the owner of the locus in quo, and the plaintiff a trespasser, was error. The court reasoned that part of the locus in quo seemed to be part of a public highway and that a jury question had been presented on that issue.
It can be seen that in the above cases the courts were concerned with the "public" character of turnpikes generally. This court would have no difficulty in holding that the right of the public to travel the Garden State Parkway and the New Jersey Turnpike, subject to the payment of tolls and compliance with reasonable rules and regulations, is identical with the right of the public in a "common" or "free" highway. Cf. Fenton v. Margate Bridge Co., 24 N.J. Super. 450 (App. Div.), certif. den. 12 N.J. 350 (1953). In this sense, at least, toll roads are "public" in character. However, the immediate issue presented in the case at bar is not to what degree the toll roads in question are subject to the rights of the public, nor is it to what extent municipalities may pave and grade turnpike roads which lie within city limits. The issue here is whether the Legislature, at the time it enacted R.S. 48:4-20, intended the word "highway" as used therein to be understood and applied in its broad general sense, or in a more restricted sense such as that urged by the plaintiffs.
There being no prior judicial construction which is of aid, the court must look elsewhere for guidance. The plaintiffs quite correctly argue that the circumstances which existed at the time the statute was enacted should be examined. Legislative intent generally is determined as of the date of the statute's enactment. However, a broader meaning may be given to legislative enactments where circumstances were nonexistent at the time the particular statute was passed. Cf. State v. Struck, 44 N.J. Super. 274 (Cty. Ct. 1957). It would therefore be incorrect to say that merely because there were no toll roads in existence in 1934, the term "highway" as used in 1934 could not be *103 broad enough to include toll roads. There are, however, other circumstances which prevent the application of the broad rule set out above.
I. The early public policy of this State to make all roads free for public use as shown by a consistent course of legislation prior to the enactment of the statute under review, makes it unlikely that the Legislature intended the word "highway" as used therein to include toll roads.
The public policy of New Jersey, as evidenced by a consistent course of legislation on a given subject matter, may be invoked to assist in ascertaining the legislative intent. River Development Corp. v. Liberty Corp., 51 N.J. Super. 447 (App. Div. 1958); Conover v. Public Service Ry. Co., 80 N.J.L. 681 (Sup. Ct. 1910).
The taxing statute here being considered, R.S. 48:4-20, was enacted in 1934 (L. 1934, c. 68). It was described by the Legislature as a supplement to L. 1916, c. 136 as amended. L. 1916, c. 136 (N.J.S.A. 48:4-14) is a franchise tax which is imposed upon every person operating an autobus in any municipality of this State.
R.S. 48:4-20 is not only a supplement to L. 1916, c. 136, but is an amplification of L. 1930, c. 223 which repealed L. 1927, c. 184. Both L. 1930, c. 223, and L. 1927, c. 184, were earlier versions of the excise tax here being construed. In both it was provided that an excise tax be paid for interstate mileage traveled over any "highway of this state." At the time each of the two statutes was enacted, the legislation providing for toll roads had not as yet been repealed. L. 1931, c. 381.
At a much earlier date, however, the Legislature had set the wheels in motion toward the eventual goal of bringing all toll roads under governmental ownership, thereby making them free for public use. As these earlier legislative enactments show, the State found that toll roads were becoming burdensome. This was due to the fact that certain of the *104 toll road companies were not properly maintaining the roads, thereby allowing them to fall into disrepair.
As early as 1882 a statute was enacted which provided that if a turnpike company did not keep its road in good repair after being notified by a complaint signed by any freeholder, it could not exact tolls on that particular road until the repairs were made. L. 1882, c. 26. Such statutes as L. 1878, c. 58, provided for the purchase of toll roads which had fallen into disrepair. Cf. L. 1886, c. 277, "An Act to provide for the purchase of turnpike and macadamized toll roads."
In 1897 the Legislature evolved a plan which speeded up governmental acquisition of privately-owned toll roads. The State offered to pay 33 1/3% of the cost of acquiring a toll road if the adjacent land owners would pay 10% and the county the remaining 56 2/3%. It is interesting to note that this statute was entitled "An Act to provide for the acquirement of turnpike roads for free public use." L. 1897, c. 191. A similar act was passed in 1901 which not only provided for the acquisition of toll roads "for free public use" but also provided for the "permanent improvement and maintenance of the same." L. 1901, c. 132.
In 1905 a statute was enacted which provided that the board of freeholders of any county, with the written approval of the state commissioner of public roads and the agreement of the toll road owner, could purchase any toll road or turnpike lying within the respective county which had theretofore been improved and which was not less than one mile in length. Any toll road so purchased was to become "a county road" and was to be "cared for, repaired, improved and maintained for free public use in the same manner that other county roads are cared for, repaired, improved and maintained." L. 1905, c. 173.
In 1908 and 1909 statutes were enacted which provided that county boards of freeholders could issue and sell bonds in order to raise money to purchase or condemn, and thereafter to improve, toll or turnpike roads. L. 1908, c. 13, *105 and L. 1909, c. 102. As a result of all of the statutes set out above, the last toll or turnpike road became "free for public use" in or shortly after 1921.
In light of this early policy to make all roads free for public use, it is unlikely that the Legislature in 1927, when the first excise tax was enacted, intended to include toll roads within the meaning of the word "highway" as used therein. L. 1927, c. 184. The later statute, L. 1930, c. 223, and the present statute, L. 1934, c. 68, do not indicate in any way that the word "highway" as there used is to be accorded a different meaning than that intended by the Legislature in the excise tax of 1927. The fact that the Legislature did not repeal all statutes relating to toll or turnpike roads until 1931 does not detract from the above position. L. 1931, c. 381.
II. The word "highway" as it is used in R.S. 48:4-20 should be afforded the same restricted meaning as must be given to the word "highway" in R.S. 48:4-23 and in R.S. 48:4-32.
It is a general rule of construction that where a word or a phrase occurs more than once in a statute, it should have the same meaning throughout unless there is a clear indication to the contrary. Clifton v. Zweir, 36 N.J. 309 (1962); Ford Motor Co. v. New Jersey Dept. of Labor & Industry, etc., 7 N.J. Super. 30 (App. Div.), affirmed 5 N.J. 494 (1950). Put more strongly, there is a presumption that a word or phrase is used in the same sense throughout a statute. DeFlesco v. Mercer County Board of Elections, 43 N.J. Super. 492 (App. Div. 1957). In Harper v. New Jersey Mfrs. Cas. Ins. Co., 1 N.J. 93, 101 (1948), the court said:
"It is an elementary rule in aid of interpretation that, barring differentiation in the context, where the same word or phrase is used more than once in a statute in relation to the same subject matter, and in one connection its meaning is clear and in another it is doubtful or obscure, it is in the latter case given the same construction as in the former." (Citations omitted)
*106 The forerunner of the present autobus excise tax was entitled, "An Act to provide for the laying of an excise on the use of highways of this State by motor vehicles operated for the purpose of carrying passengers or property for hire in interstate commerce." L. 1927, c. 184. This tax applied to all common carriers of persons or property for hire, excepting only those vehicles, locomotives or cars operated on rails or through the use of wires and trolleys. Section 3 of the act provided that:
"All moneys derived from the excise hereby imposed shall be turned over monthly to the Treasurer of the State, and such revenues are hereby appropriated to the State Highway Commission for use by it for the construction and maintenance of State highways."
The penalty imposed for failure to comply with this act was the suspension of motor vehicle registrations.
The next version of the present excise tax was L. 1930, c. 223, which was entitled, "A Supplement to an act entitled `An act concerning autobusses and their operation,' approved March seventeenth, one thousand nine hundred and sixteen." Section 5 of this act repealed L. 1927, c. 184, and made the excise tax applicable solely to auto busses. Section 2 provided that all moneys derived from the tax were to be used for "the construction and maintenance of highways." Section 4 made the penalty for failure to comply with its provisions the payment of a fine. The monies derived from the collection of fines were "appropriated to the State Highway Commission for use by it for the construction and maintenance of highways."
The present statute, L. 1934, c. 68, makes the tax applicable to autobusses only (sec. 1), directs that the monies derived therefrom be used for the construction and maintenance of highways (sec. 4), and directs that collected fines be appropriated for the use of the State Highway Commission for the construction and maintenance of highways (sec. 13).
*107 To the extent that each of the above statutes directs that the collected tax and fines be appropriated for "highway" construction and maintenance, the word "highway" must be understood in a restricted sense so as to exclude toll roads. The Legislature could not have intended the word to be broad enough to include privately operated toll roads since it would have been unconstitutional for the State Highway Commission to spend money to improve or construct roads for private toll road companies. N.J. Const. 1844, Art. I, par. 20, as amended in 1875, proclaimed that:
"No donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation whatever."
The giving of public funds or property to a private corporation has been held to be unconstitutional whether made directly or indirectly. Cf. Wilentz v. Hendrickson, 133 N.J. Eq. 447 (Ch. 1943), affirmed 135 N.J. Eq. 244 (E. & A. 1944); In re Voorhees, 123 N.J. Eq. 142 (Prerog. 1938), affirmed 124 N.J.L. 35 (E. & A. 1939).
Toll road companies were solely responsible for the repair, maintenance and construction of their roads. It was pointed out earlier in this opinion that statutes were enacted which provided penalties to be imposed upon those toll road companies which allowed their roads to fall into disrepair. Later statutes made governmental supervision and control of the repair and maintenance of toll roads applicable only after a privately-owned toll road had been abandoned or had been acquired by the State or one of its political subdivisions. The State Highway Commission and its successor, the State Highway Department, have never been authorized or directed by the Legislature to construct or maintain toll roads.
While a direct legislative appropriation to the New Jersey Turnpike or the Garden State Parkway might not be unconstitutional, any diversion to either of these expressways *108 of funds appropriated for Highway Department use would be unlawful. In New Jersey Turnpike Authority v. Parsons, 3 N.J. 235, 247 (1949), the court said:
"Nor has the State Highway Commissioner the right to divert funds appropriated to the State Highway Department or to render services for a project that is not within the scope of the duties confided to his Department. Whatever engineering or related services he may have supplied cannot conceivably relate to the work of his Department. The contemplated turnpike will cost so many times his total annual appropriation that it could not possibly be a project of his Department." (Emphasis added)
Further, for the State Highway Department to make expenditures out of its own funds for the benefit of a public corporation such as the Turnpike Authority would be to ignore N.J. Const. 1947, Art. VIII, Sec. 2, par. 2, which provides that "no money shall be drawn from the State treasury but from appropriations made by law." Cf. New Jersey Turnpike Authority v. Parsons, supra.
While the word "highway" is often used in a board, general manner, the meaning of such general words will be restricted whenever this is necessary to carry out the legislative intention. DeFazio v. Haven Savings & Loan Ass'n., 22 N.J. 511 (1956). It becomes necessary in order to sustain the validity of the taxing statute to restrict the meaning of the word "highway" in those sections which relate to the disposition to be made of collected taxes and fines, to include only those toll-free highways within the jurisdiction of the State Highway Department. Following the general rule that courts should presume that the Legislature intends a word to be given the same meaning throughout a statute, plus the fact that better reasoning and the spirit of the statute seem to demand such a result, it is the opinion of this court that the word "highway," as used in R.S. 48:4-20, is restricted so as to exclude from its purview any road not within the jurisdiction of the State Highway Department. The New Jersey Turnpike and the Garden State Parkway not being within the jurisdiction and control *109 of the State Highway Department, are not "highways" within the meaning of the word as it is used in R.S. 48:4-20.
III. The tax statute here being reviewed was intended to compensate the State of New Jersey for the financial burden imposed upon it due to the maintenance and construction of its highways. Use of the New Jersey Turnpike and the Garden State Parkway imposes no financial burden on the State.
The New Jersey Turnpike and the Garden State Parkway were designed to be, and are, completely self-sustaining. State aid is specifically denied in the statutes creating both Authorities. N.J.S.A. 27:23-1; N.J.S.A. 27:12B-5.
That both Authorities are completely autonomous was shown by evidence introduced at the trial of this case. It was shown by plaintiffs that both Authorities transact business at arm's length with the several departments of the State. Land has been sold to the Highway Department, the Fish and Game Commission, and the Motor Vehicle Department at prices indicative of market values. The State is reimbursed for all direct costs of policing the Turnpike and Parkway, including the cost of training state troopers. It was shown that for the year ending December 31, 1961, the Turnpike Authority alone paid to the State $1,161,947 for traffic control and police expenditures. Both Authorities maintain their own wrecking services, ambulances and fire equipment. Further, and what is more important, with the exception of three toll-free sections of the Garden State Parkway which are under the exclusive jurisdiction of the State Highway Department, the cost of maintenance and construction is borne solely by the Turnpike and Highway Authorities. The Turnpike Authority's 1961 annual report showed in the "Statement of Revenues and Operating Expenses Year Ended December 31, 1961" that $2,960,683 had been spent for maintenance, repair, replacement and reconstruction. Any incidental expenses which may be borne by the State are not such as would necessitate a *110 finding that the State is burdened financially by Turnpike and Parkway operations. Proof of this position lies in the fact that the State, through its various departments, has never rendered any bills to the Authorities for "incidental" expenses which it might incur. The position taken by the defendants, that because of Turnpike and Parkway operations the State of New Jersey sustains an increased financial burden which necessitates, or rather supports, a holding that the excise tax was intended to include independently operated toll roads, is without merit.
It is important at this time to note that the Formal Opinion of Attorney General Parsons (78 Op. Atty Gen. (1950)) which held that R.S. 48:4-20 did not apply to Turnpike mileage was based on the theory set forth in this argument. This opinion was followed for ten years until "overruled" by 11 Op. Att'y Gen. (1960). While not binding on the courts, uniform administrative interpretation of a statute over a considerable length of time will be afforded respect and will not be lightly disregarded. Cf. In re Borough of Glen Rock, 25 N.J. 241 (1957); Newberry v. Neeld, 46 N.J. Super. 216 (App. Div.), certif. den. 25 N.J. 132 (1957).
The "overruling" opinion (11 Op. Atty. Gen. (1960)) was primarily aimed at the constitutional questions which arise from the present application of the excise tax. It was said therein that the former opinion (78 Op. Atty Gen. (1950)) was probably influenced by early decisions of the United States Supreme Court in that area of constitutional law relative to interstate commerce. There is no basis for such a probability, since interstate commerce and the Constitution were never mentioned in Attorney General Parsons' 1950 Opinion. It was Attorney General Parsons' opinion that "any such turnpike project constructed pursuant to such act [Turnpike Authority Act of 1948] is not a highway within the intendment of R.S. 48:4-20." The Attorney General's opinion of 1960 met this argument by taking the position that early decisions of the New Jersey courts *111 have held turnpikes to be "public highways" within the meaning of that phrase as it is customarily used in the statutes of this State, citing Miller v. Penna-Reading Seashore Lines, supra; Atlantic & Sub. Ry. Co. v. State Board Assessors, supra; State, Parker v. City of New Brunswick, supra, and Fenton v. Margate Bridge Co., 24 N.J. Super. 450 (App. Div. 1953). This court has already given its reasons why this position is untenable.
The excise tax being of a compensatory nature, the Legislature could not have intended to include within the ambit of the tax, mileage traveled over the New Jersey Turnpike or the Garden State Parkway, due to the fact that tolls paid by the users of these expressways obviate the necessity for the State to seek compensation.
IV. The New Jersey Turnpike Authority and The New Jersey Highway Authority are in but not of the Highway Department. As such, they are independent corporate entities whose roads are not "highways of this state" within the meaning of N.J.S.A. 48:4-20.
This court is aware of and respects, but in relation to the issue here being decided is in no wise bound by, the decisions of the Pennsylvania Supreme Court in Transamerican Freight Lines, Inc. v. Commonwealth of Pennsylvania, 396 Pa. 64, 151 A.2d 630 (Sup. Ct. 1959), cert. den. 361 U.S. 882, 80 S.Ct. 153, 4 L.Ed.2d 118 (1959), and Shirks Motor Exp. Corp. v. Messner, 375 Pa. 450, 100 A.2d 913 (Sup. Ct. 1953), appeal dismissed for lack of a substantial federal question, sub nom Interstate Motor Freight System v. Messner, 347 U.S. 941, 74 S.Ct. 639, 98 L.Ed. 1090 (1954). In the Shirks case it was held that the imposition of tolls plus the Pennsylvania gross receipts tax upon users of the Pennsylvania Turnpike was not unconstitutional. Since the court decided the case on the question of the constitutionality of the gross receipts tax as applied to interstate users of the Pennsylvania Turnpike, it cannot be authority for the exact point here being decided. In the Transamerican case, however, in addition *112 to disposing of the constitutional question of the application of the gross receipts tax to interstate users of the Pennsylvania Turnpike, the court held that the Pennsylvania Turnpike is a state highway within the meaning of the Pennsylvania gross receipts tax. The Supreme Court, in affirming the decision of the Dauphin County Court of Common Pleas, quoted from Judge Neeley's opinion wherein it was said:
"The appellant contends that the Turnpike mileage should not be used in the taxing formula because the Turnpike is not a State highway. This contention is without merit.
An examination of the applicable statute and its supplements indicates that it was intended by the Legislature that the Turnpike should become part of our State highway system. This purpose is clearly revealed in the title of the original Act of May 21, 1937 * * *.
We believe that the statutes, inter alia, provide that the Pennsylvania Turnpike Commission is an instrumentality of the Commonwealth which fulfills an essential governmental function and possesses the power to issue bonds of the Commonwealth; that the Turnpike is to be maintained and repaired through the Department of Highways; and further when all bonds have been paid the Turnpike is to become part of the system of State Highways and be maintained by the Department of Highways free of all tolls." (Emphasis added) (151 A.2d, at pp. 633, 634)
While the New Jersey Turnpike Authority and the New Jersey Highway Authority are public corporations, they are independent, autonomous corporate entities whose roads are not a part of the state highway system. In New Jersey Highway Authority v. Parsons, supra, the court said:
"Though created by the State and subject to dissolution by the State, they [public corporations] are in the eyes of the law independent entities and the State is not responsible for their debts and liabilities, whether they be municipal corporations or counties or such specialized bodies as the Port of New York Authority; cf. California Toll Bridge Authority v. Wentworth, 212 Cal. 298, 298 P. 485 (1931). * * * It is also objected that the Turnpike Authority is the alter ego of the State and not a self-sufficient public corporation because it is a body corporate and politic `in the State Highway Department,' R.S. 27:23-3, N.J.S.A. This statutory provision is manifestly intended to be a compliance with the constitutional provision requiring that `all executive and administrative offices, departments, *113 and instrumentalities of the State government, including the offices of Secretary of State and Attorney General, and their respective functions, powers and duties, shall be allocated by law among and within not more than twenty principal departments,' Article V, Section IV, par. 1. But the State Highway Commissioner is given no authority whatsoever over the Turnpike Authority. The Turnpike Authority is in but not of the State Highway Department and that fact does not make it any the less an independent entity, as the language of the entire Act clearly demonstrates. (3 N.J., at pp. 243, 244) (Emphasis added)
The court also said (at p. 247), "The Turnpike Authority cannot blow hot and cold in the same breath; it either is an autonomous corporation or it is not."
The Garden State Parkway and the New Jersey Turnpike must be viewed then, as the roads of independent, autonomous corporations, to wit, the N.J. Turnpike Authority and the New Jersey Highway Authority. As such they occupy, and will so occupy until such time as they are turned over to the New Jersey Highway Department and are made free for public use, a status not unlike the roads owned and operated by the old privately owned toll road companies. It has been shown earlier in this opinion that the Legislature, at the time R.S. 48:4-20 was enacted, could not have intended to include this type of road within the ambit of the tax imposed pursuant to R.S. 48:4-20.
While a state might have the right, with reference to a given subject matter, to tax its subjects or those who use its facilities, statutes of a tax nature must be treated with caution by our courts lest in our zeal to benefit the State we may overlook the well being of the people. This view is in harmony with the general rule that ambiguities in legislation of a tax nature must be strictly construed against the taxing power and in favor of the taxpayer. Cf. Harper v. New Jersey Mfrs. Cas. Ins. Co., 1 N.J. 93 (1948).
For the reasons given in the body of this opinion, it is the holding of this court that the New Jersey Turnpike and the Garden State Parkway are not "highways" within *114 the meaning of R.S. 48:4-20. The defendants are henceforth enjoined from enforcing R.S. 48:4-20 with respect to interstate mileage traveled on the New Jersey Turnpike and the Garden State Parkway and are ordered to refund all sums paid by the plaintiffs under R.S. 48:4-20 on account of interstate mileage traversed over the New Jersey Turnpike and Garden State Parkway since June 1, 1960.
An appropriate order may be submitted.